OLYMPIA SAUNA COMPANIA NAVI-
ERA, S.A., as Owner of the M/V
YPATIA HALCOUSSI, Plaintiff,

v.

UNITED STATES of America, et
al., Defendants.

UNITED STATES of America,
Third-Party Plaintiff,

v.

Kenneth FLETCHER, in personam and
the M/V YPATIA HALCOUSSI, Her
Engines, Tackle, Appurtenances, etc., in
rem, Third-Party Defendants.

Kenneth FLETCHER,
Fourth-Party Plaintiff,

v.

KERR STEAMSHIP COMPANY, INC.,
a New York corporation,
Fourth-Party Defendant.

Civ. No. 80–699LE.

United States District Court,
D. Oregon.

Sept. 11, 1984.

Robert I. Sanders, Paul N. Wonacott, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for plaintiff.

Paul Gary Sterling, Pecos Bill Field, U.S. Dept. of Justice, Torts Branch, Civil Division, San Francisco, Cal., for defendant.

## OPINION and ORDER

LEAVY, District Judge:

The *Ypatia Halcoussi* was being piloted by a local river pilot in March 1980 when she turned onto Warrior Rock Reef, in the Columbia River. Her owner, the plaintiff Olympia Sauna Compania Naviera (Olympia), a Panamanian corporation, claims that the United States Coast Guard negligently mispositioned a buoy that marks the reef. Olympia contends that the mispositioned buoy was the sole cause of the vessel's grounding. Olympia claims entitlement to damages under the Suits in Admiralty Act. 46 U.S.C. §§ 741–752.

The defendant, the United States, denies that Warrior Rock Reef Lighted Buoy No. 4 (Buoy No. 4) was mispositioned. The United States contends, rather, that the vessel and her pilot were negligent. The United States also contends that jurisdiction must be exercised only under the Public Vessels Act, 46 U.S.C. §§ 781–790.

The case was tried to the court on the question of which jurisdictional statute applies, and on the issue of liability.

### I. Factual Background

From March 5th until the evening of March 8, 1980, the *Ypatia Halcoussi* docked at a grain elevator in Kalama, Washington. On March 8th, after receiving 43,000 tons of grain, the vessel's crew readied her to travel up the Columbia to Swan Island.

To reach Swan Island, the *Ypatia Halcoussi* would have to travel around Warrior Rock and through Warrior Rock Range,[1] in a restricted waterway with a navigable channel 600 feet wide and 40 feet deep (at zero tide). The area is a difficult one in which to navigate deep-draft vessels; use of local river pilots is provided for by statute.[2]

Shortly after returning from two weeks off duty, Kenneth Fletcher, a licensed Columbia River Pilot, was dispatched to pilot the *Ypatia Halcoussi* on March 8, 1980. Fletcher had traveled the Columbia thousands of times. He had piloted vessels on the Columbia approximately 800 times before March 8, 1980; approximately 200 of those trips were upbound through Warrior Rock Range in the evening. Fletcher had

---

1. *See* Appendix 1.

2. Or.Rev.Stat. § 776.405.

piloted vessels similar to the *Ypatia Halcoussi*, which is a steel-hulled stern-ender 830 feet long, with a 160-feet beam, and displacing 85,000 tons.

Once on board, Fletcher spoke with the master, Captain Ioakim Sarelis, who informed Fletcher about vessel procedures. Fletcher ascertained that the vessel had operable radar and radio. He also determined, after piloting the vessel away from the dock without difficulty, that the gyrocompass had a two-degree easterly error. The vessel's draft readings at departure were reported to Fletcher as 30 feet 10 inches forward, 34 feet 10 inches aft.

As the vessel left Kalama and proceeded upriver, Fletcher did not consult navigational charts. Rather, he relied on his eyesight and the knowledge he had accumulated during years of piloting in the area. Visibility was unlimited for fifteen miles.

Captain Sarelis, the quartermaster, and the mate were on the bridge with Fletcher while he piloted. As the *Ypatia Halcoussi* approached St. Helens junction, Fletcher announced her position by radio. An outbound tug towing logs, the *Cleo Brusco*, responded that it was at Henrici Landing. Soon afterward, Fletcher could see the tug near Bachelor Island on the Washington side of the river.

Fletcher, conscious that the tug probably intended to cross the river, ordered the quartermaster to put the *Ypatia Halcoussi* on a 185-degree course. As was customary for river pilots facing an oncoming tug in the area, Fletcher piloted the vessel to the starboard (right) side of the channel to give the tug the most space possible. When the

*Ypatia Halcoussi* passed Light No. 2, Fletcher watched Buoy No. 4, in relation to Light 4A, to determine when the vessel could safely turn and circumvent Warrior Rock Reef. Light 4A is upriver from Buoy No. 4. It is customary for Columbia River Pilots to use Light 4A and Buoy No. 4 to form a line of position,[3] which the pilots wait to cross before beginning the turn.

Fletcher ordered a two-stage turn: he first ordered a rudder change of 10 degrees starboard and a course of 190 degrees; almost immediately afterward, he ordered another 10-degree starboard rudder and a course of 200 degrees. Fletcher stepped to the vessel's port (left) side and viewed the Warrior Rock Range lights [4] to the rear. Shortly thereafter, the vessel struck Warrior Rock Reef, upriver from Buoy No. 4.

Buoy No. 4, first established in 1929, is within a national system of aids to navigation for which the United States Coast Guard is responsible. The Coast Guard provides and maintains aids that serve the needs of commercial navigators.[5] The Coast Guard is comprised of a Commandant and Headquarters in Washington D.C., two Area Offices, and various District Offices which operate in specific geographical areas of the country. Each District Office supervises both floating and shore units.[6] Washington and Oregon aids to navigation are maintained by the Thirteenth District Office (the District Office) in Seattle, Washington.[7]

The Coast Guard maintains a national buoyage system to warn mariners of dangers and to show channel directions. Buoys indicate—by their colors, shapes,

---

**3.** The line of position is considered one of the most important of piloting concepts. A segment of a great circle, the line of position visually appears as a straight line. The simplest way of establishing a line of position is to observe range.

 If two fixed objects of known position appear to the observer to be in line, he must at that instant be somewhere on the line passing through the objects and extending beyond it. He can also take comfort from the negative aspects of his line of position; if he is on the range line, he is certainly *not* somewhere off of it such as in shoal water or headed into some other hazard.

E. Mawney, *Dutton's Navigation and Piloting*, 253 (13th ed. 1978) (hereinafter *Dutton's* ).

**4.** Range lights are positioned in relation to each other so that the line or range between them, extended over water, delineates a preferred channel. (The term range is also used to refer to a stretch of water, such as Warrior Rock Range. *Dutton's, supra* n. 3, at 119, 142.)

**5.** *See* 33 C.F.R. § 60.01–1.

**6.** *Id.* at § 3.01–1.

**7.** *Id.* at § 3.65–1.

numbers, and light characteristics—on which side they should be passed by vessels moving in a given direction. Buoy No. 4 is a red flashing buoy; red indicates a wreck or obstruction to be passed by keeping the buoy to starboard. Buoys generally do not maintain exact positions and are thereby distinguishable from fixed navigational marks.[8]

In 1979 and 1980, under the supervision of the District Office, the Coast Guard Cutter *Whitebush* serviced and positioned Buoy No. 4. The *Whitebush* is a 333-foot Coast Guard buoy tender with responsibility for floating aids to navigation in a geographic area encompassing the Columbia River, the Washington coast, and the Oregon coast down to Coos Bay. On March 5th and 6th in 1980, the *Whitebush* crew used positioning methodology that was initiated in the district in mid-1979. At the direction of the District Office and pursuant to the adoption of a positioning project designed to improve the accuracy of aid positioning, the crew used sextants to take angles. The District Office supplied the buoy tender personnel with recommended objects from which to take angles, and computer grids on which the angles were to be recorded. The position of the vessel was derived from the intersection of the angles. The center of the grid was the center of the charted position[9] for Buoy No. 4, and represented the goal position for setting the buoy. The ideal for the grid system is that the plotter fixes the vessel's position (derived from the angles taken) at the grid's center and recommends to the commanding officer that the buoy's sinker be set at that point.

8. The Coast Guard publishes a light list with general locations. The March 8, 1980 published position of Warrior Rock Buoy No. 4 was "in 23 feet, southerly of Warrior Rock." III United States Coast Guard, The Pacific Coast and Pacific Islands Light List, 104 (1980). *See* Pretrial Order, Agreed Fact (e).

9. The National Oceanic and Atmospheric Administration (NOAA) publishes navigational charts showing buoy positions. A 1979 NOAA chart showed by buoy symbol the position of Buoy No. 4 in March 1980. *See* Pretrial Order, Agreed Fact (f)

On March 5, 1980, the *Whitebush* crew was unable to position Buoy No. 4 within the target circle. After four hours of attempting to position the buoy, the *Whitebush* crew left it off its charted position and spent the night at St. Helens. The next morning the *Whitebush* returned and her crew repositioned the buoy. Two days later, the *Ypatia Halcoussi* hit the reef.

## II. Jurisdiction

■ The United States cannot be liable for money damages without having waived its sovereign immunity. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). Admiralty claims may only be brought against the United States under two statutes: the Suits in Admiralty Act (SAA), 46 U.S.C. §§ 741–752, and the Public Vessels Act (PVA), 46 U.S.C. §§ 781–790. *Williams v. United States,* 711 F.2d 893, 895 (9th Cir.1983). Olympia has the burden of demonstrating that the United States has waived immunity in this case; failure to carry that burden deprives the court of subject matter jurisdiction. *See United States v. United Continental Tuna,* 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976).

■ Both the SAA and the PVA are waivers of sovereign immunity in maritime cases, and Olympia's claim is clearly maritime in nature.[10] Immunity is not necessarily waived in this case, however. Although the SAA[11] is worded broadly enough to encompass this action, the SAA may not be invoked as an alternative jurisdictional basis for a case that is subject to the PVA. *United Continental Tuna,* 425

10. *See Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (defining jurisdiction over maritime torts).

11. In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, *or if a private person or property were involved,* a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States or against any corporation mentioned in section 741 of this title.
46 U.S.C. § 742 (emphasis added).

U.S. at 181, 96 S.Ct. at 1328. This rule is particularly significant to a foreign plaintiff who must, as a condition precedent to the court's exercise of jurisdiction under the PVA, prove that in similar circumstances a U.S. national could sue the plaintiff's country for damages. 46 U.S.C. § 785.

The United States, relying on *United Continental Tuna,* argues that this case is subject to the PVA because it is an action for "damages caused by a public vessel of the United States." 46 U.S.C. § 781.[12] Olympia, on the other hand, argues that the facts of this case transcend the activities of the buoy tender *Whitebush* to inextricably involve the District Office. Olympia asserts that the action may not be properly characterized as one for damages caused by the *Whitebush* alone, and that, in essence, the *Whitebush's* involvement was almost incidental.

■ Whether this is an action for damages caused by the *Whitebush,* within the meaning of the PVA, is not indisputably answered by the Act, its legislative history, or by interpretive caselaw. Both the Supreme Court and the Ninth Circuit have endorsed broad application of the phrase "damages caused by a public vessel." In *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945), a Navy patrol boat ordered a steamship to follow directly astern. "For all practical purposes she was as firmly fastened to the stern ... as if she had been in tow." *Id.* at 229, 65 S.Ct. at 646. While following the public vessel as ordered, the

steamship ran into a wreck. The Court held that the damage to the steamship was "caused" by the public vessel. The Court rejected a reading of the phrase that required a collision with the public vessel. The PVA is not limited to recovery of damages caused by the public vessel as the physical instrument of harm, but includes actions for damages caused by the negligent possession or operation of the vessel. *Thomason v. United States,* 184 F.2d 105 (9th Cir.1950) (permitting PVA action by seamen for wages for work performed on government tugs).

The *Whitebush,* obviously a public vessel, moved Buoy No. 4 just days before the *Ypatia Halcoussi* struck the reef. No other vessels or environmental conditions were shown at trial to have significantly affected the buoy's position on March 8, 1980. If the buoy's sinker was placed so that the buoy was dangerously mispositioned, it is arguable that this is an action for "damages caused by a public vessel."

Olympia's allegations [13] and proof, however, do not confine the operative facts of causation to the activities of the *Whitebush. Canadian Aviator,* 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 and *United States v. United Continental Tuna,* 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) are factually distinguishable. Policy considerations in this case also differ from those considered in *Canadian Aviator, United Continental Tuna,* and in *Thomason v. United States,* 184 F.2d 105 (9th Cir. 1950).[14]

---

**12.** The PVA authorizes a libel *in personam* against the United States "for damages caused by a public vessel of the United States." 46 U.S.C. § 781. The PVA provides that suits involving public vessels "shall be subject to and proceed in accordance with the provisions of [the SAA] or any amendment thereof, insofar as the same are not inconsistent herewith ...." *Id.* § 782. The PVA's inconsistencies with the SAA include restricting subpoenas to officers and crew members of a public vessel, barring recovery of prejudgment interest, and imposing a requirement of reciprocity.

**13.** *See* Pretrial Order, Olympia's Contentions of Fact (e), (i), and (j).

**14.** In *Canadian Aviator,* which antedates the 1960 SAA amendment, the Court decided that

the PVA was not limited to collision cases because the Court concluded that the PVA "is not to be thwarted by an unduly restrictive interpretation." 324 U.S. at 222, 65 S.Ct. at 643. The plaintiff could not have brought the action under the SAA, which at that time only covered actions relating to government merchant vessels. *See* 43 Stat. 1112; *Canadian Aviator,* 324 U.S. at 220–21, 65 S.Ct. at 642–43. The plaintiff's allegations focused only on the negligence of the Navy patrol vessel and her crew. *Id.* at 217 n. 4, 65 S.Ct. at 641 n. 4 and accompanying text.

In *United Continental Tuna,* the Supreme Court decided that a Philippine corporation, whose fishing vessel collided with a U.S. Naval Destroyer, could only sue the U.S. under the PVA. The Court opined that the reciprocity

On the basis of factual findings and reasons stated below, the court finds that the negligent placement of Buoy No. 4 caused the *Ypatia Halcoussi's* grounding in 1980. The operative facts of causation cannot be limited to the *Whitebush's* activities. The court finds that the participation of the District Office in the positioning of the buoy is practically inseparable from the *Whitebush's* participation. For example, determinants of where the buoy was to be set were in large part provided by the District Office. The objects used for taking angles were identified, at the initiation of the positioning project, for the District Office by the *Whitebush*. The District Office, however, put information provided by the *Whitebush* and other units into the District Office's computer programming. The District Office then generated, by computer, data sheets and positioning grids for the *Whitebush* to use in positioning Buoy No. 4. The District Office selected preferable objects from those identified by the *Whitebush* for use in taking angles. The *Whitebush* employed the methodology and data supplied by the District Office. Because the court does not find that the *Whitebush* crew improperly used the suggested methodology or data, the court cannot find that the *Whitebush* alone caused the grounding.

Further, as noted earlier, Buoy No. 4 is part of the national aids to navigation system maintained by the Coast Guard. Only some of the aids in that system are buoys. Shore aids are also maintained. An action for failure to maintain a shoreside aid is not subject to the PVA. *See, e.g., Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (failure to maintain lighthouse actionable under the Federal Tort Claims Act 28 U.S.C. §§ 2671–2680 (FTCA)). To separate actions brought for the failure to maintain aids to navigation on the basis of which Coast Guard unit maintained the aid, is to cement fortuity into recovery in aids to navigation cases.[15] This separation would hardly foster the policy that uniformity in maritime cases is desirable. Further, in cases like this one, the operative facts of causation would have to be determined at trial before the court could choose the applicable jurisdictional statute. In cases brought by foreign plaintiffs who cannot prove reciprocity, going to trial to find out whether the court has jurisdiction under the SAA is not an efficient use of either the court's or the parties' resources. If facts proven at trial demonstrated that

requirement was a deliberate congressional policy that was central to the PVA. 425 U.S. at 171, 96 S.Ct. at 1324. The Court did not grapple with counterbalancing policies beyond deciding that the SAA 1960 amendment was not intended to nullify the policy judgments made by Congress in the PVA. *Id.* at 181, 96 S.Ct. at 1328.

In *Thomason v. United States,* 184 F.2d 105 (9th Cir.1950), the court concluded that seamen could bring an action for wages against the government under the PVA. The court rested its decision, in part, on furthering the policy of providing "for the adjudication of seaman controversies in the admiralty courts." *Id.* at 107. *See also United States v. Loyola,* 161 F.2d 126, 127 (9th Cir.1947) (action for maintenance and cure permitted under PVA in part because of "long established rule that legislation affecting a seaman's injuries . . . is to be construed liberally in the seaman's favor").

15. The variety of statutes invoked in this type of case suggests that applying the SAA uniformly would eliminate inconsistencies that already exist. *See, e.g., Afran Transport Co. v. United States,* 435 F.2d 213 (2nd Cir.1970) (affirming trial court decision under SAA that Coast Guard

negligently maintained buoy); *Tringali Bros. v. United States,* 630 F.2d 1089 (5th Cir.1980) (buoy misplacement by Coast Guard negligent under FTCA); *Cornell Steamboat v. United States,* 247 F.2d 275 (2nd Cir.1957) (Coast Guard negligently failed to mark wreck—judgment issued under FTCA and decree under PVA); *Somerset Seafood v. United States,* 193 F.2d 631 (4th Cir.1951) (negligent marking of wreck actionable under FTCA); *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir.1971) (action for damage allegedly caused by inadequate government Coast and Geodetic Survey Charts published for mariners brought under SAA); *Chute v. United States,* 610 F.2d 7 n. 2 (1st Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) (action for damage allegedly resulting from Coast Guard's inadequate marking of wreck decided under SAA); *Magno v. Corros,* 630 F.2d 224 (4th Cir. 1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981) (Coast Guard's alleged negligence in choice of light used to mark dike, jurisdiction under SAA).

causation was confined to the negligent operation of the public vessel, then the PVA would apply and the court would be powerless to decide the case. *See United States v. United Continental Tuna*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976).

■ Policy considerations, too, lead me to conclude that this case (and any similar aid to navigation case) [16] is better characterized as a maritime tort action against the Coast Guard—the entity responsible for the entire aids to navigation system. The 1960 amendment to the SAA authorized *in personam* suits against the government that would be maintainable "if a private person or property were involved." 46 U.S.C. § 742. The Ninth Circuit construes the amendment as having brought within admiralty jurisdiction under the SAA all maritime tort claims that previously were brought on the law side of the court under the FTCA. *Roberts v. United States*, 498 F.2d 520 (9th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974); *see also United States v. United Continental Tuna*, 425 U.S. 164, 176 n. 14, 96 S.Ct. 1319, 1326 n. 14, 47 L.Ed.2d 653 (1976); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir.1971). *But see* Note, *The Suits in Admiralty Act: Sovereign Benevolence in Need of Reform*, 8 Mar.L. 283 (1982). Actions for negligent maintenance of aid to navigation are easily subsumed by the amendment. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

The PVA's reciprocity requirement reflects the congressional determination to narrow the waiver of sovereign immunity in suits brought by foreign nationals. Although the doctrine of sovereign immunity is generally waning, the reciprocity requirement is entitled to judicial deference.

*United Continental Tuna*, 425 U.S. at 181, 96 S.Ct. at 1328. I conclude, however, that the proshipping policy that underlies the SAA [17] and in part, the government's undertaking of an aid to navigation system,[18] and the policies of promoting judicial efficiency and uniformity of results, outweigh the importance of preserving sovereign immunity by applying the PVA. It was, after all, uncertainty about the applicable jurisdictional statute in particular cases that prompted Congress to amend and broaden the SAA in 1960. I conclude that the court may exercise jurisdiction under the SAA.

### III. Findings of Fact

Based on evidence received at trial and by stipulation of the parties, the court makes the following specific factual findings.

Columbia River Pilots for years have customarily relied on Buoy No. 4, in conjunction with Light 4A, in deciding when to turn a vessel and safely avoid Warrior Rock Reef, steadying on a course in safe water up Warrior Rock Range. The customary use of the line of position formed by Light 4A and Buoy No. 4 as the point to cross before turning is, in the circumstances of navigating day and night past Warrior Rock, reasonable and consistent with prudent pilotage. The Coast Guard was, before and during March 1980, aware that Columbia River Pilots use Buoy No. 4 in this manner.

Pursuant to the Aids to Navigation Positioning Project implemented by the District Office in 1979, the District Office provided the *Whitebush*, in 1979 and in 1980, with suggested angles and grids for positioning Buoy No. 4. The District Office also provided the *Whitebush* with positioning records on which the *Whitebush* was to record designated information relating to the buoy's positioning. Information re-

---

**16.** *See* 14 U.S.C. §§ 2 and 81; 33 C.F.R. §§ 60.01–5(a), and 62.25–1 to 62.25–60.

The term 'aid to navigation' means any object or device, external to a vessel, that is intended to assist a navigator in fixing his position or determining a safe course past hazards to navigation ... [including] fixed and floating objects such as lights, lightships,

buoys, day beacons, and fog signals, plus ... radio beacons ....

*Dutton's, supra* n. 3, at 117.

**17.** *See De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 142–43 (5th Cir.1971).

**18.** *See* 33 C.F.R. § 60.01–1.

corded on the positioning record was, after the buoy was positioned, mailed to the District Office for evaluation of whether the buoy was adequately positioned. The District Office then determined the most probable position of the buoy. If the most probable position deviated from the target—the charted position—then the District Office's procedure was to decide whether the deviation was likely to mislead prudent mariners. In 1979, although Buoy No. 4 was not on its charted position, the District Office decided not to order the *Whitebush* to reposition the buoy. The buoy had a tendency to move off its charted position.

On March 5th and 6th, in 1980, the *Whitebush* employed, as directed, the objects and grid suggested by the District Office for use in positioning Buoy No. 4. The *Whitebush* was informed on March 5th that the buoy was approximately 100 feet to 150 feet off its charted position toward the Oregon side of the river. On March 5th, the *Whitebush* found Buoy No. 4 and left it off its charted position. On March 6, 1980, the *Whitebush* positioned Buoy No. 4 according to the grid positioning system.

Only hours before the *Ypatia Halcoussi* grounded, another river pilot, Vinton Stratton, whom I find credible, piloted another vessel past Buoy No. 4 upbound. Stratton knew from seeing the buoy off position on March 5th, and from speaking to pilots since then, that Buoy No. 4 was probably significantly off its charted position toward the Oregon shore. Stratton consequently anticipated the misplacement of the buoy by waiting longer than usual after crossing the Light 4A and Buoy No. 4 line of position to turn. Stratton still had difficulty turning onto Warrior Rock Range. He testified that even though Buoy No. 4 looked even more out of position on March 8th than it had March 5th, it was difficult to ignore the buoy because "it's hard to disregard something you have done for all those years." Transcript at 155. I find that Buoy No. 4 was not on its charted position on March 8th.

I find that Buoy No. 4 is not necessarily dangerously misleading to mariners if it is off the 1980 charted position. I further find, however, that if Buoy No. 4 is off that charted position and sufficiently toward the Oregon side of the river, the buoy is dangerously misleading to Columbia River Pilots. I find that on March 8, 1980, Buoy No. 4 was off its charted position toward the Oregon side enough that Buoy No. 4 dangerously misled Fletcher to turn the *Ypatia Halcoussi* too soon. I further find that had the vessel not turned too early, she would not have struck Warrior Rock Reef. Had Buoy No. 4 been on its charted position, Fletcher would not have turned too early and the vessel would not have grounded.

Fletcher used the Warrior Rock Range Lights as soon as was practicable. I find that Fletcher did not discern from the lights that he was too close to the Oregon shore. Had Fletcher been able to tell from the lights that the vessel was in trouble, however, by the time he could prudently consult the lights, he could not have made a correction in time to prevent the grounding. I find that neither Fletcher nor the vessel's crew was negligent. Suction was not a determinant in the grounding. I further find that neither the use of a lookout nor radar or other electronic equipment could have prevented the grounding. I further find that Fletcher's reliance on his eyesight and local knowledge of the river, rather than plotting on navigational charts, was reasonable and consistent with prudent pilotage.

I find that the Coast Guard did not notify mariners that Buoy No. 4 was off its charted position in March 1980 and significantly toward the Oregon shore. I further find that the Coast Guard was negligent in allowing Buoy No. 4 to remain off its charted position where it would dangerously mislead river pilots to turn too soon to avoid Warrior Rock Reef. The dangerously misleading position of Buoy No. 4 was the sole cause of the *Ypatia Halcoussi's* grounding in March 1980.

## IV. Conclusions of Law

 The evidence, construed as stated in the court's factual findings, preponderates that Buoy No. 4 was dangerously off its charted position March 8th; Fletcher

reasonably relied on the buoy in deciding when to turn the *Ypatia Halcoussi.* The reliance that Fletcher placed on Buoy No. 4 is that traditionally placed on the buoy by Columbia River Pilots. The United States Coast Guard knew this and consequently had a duty to maintain the buoy where it would not dangerously mislead mariners. *See Indian Towing v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955); 14 U.S.C. § 2. The evidence of the Coast Guard's negligence more than overcomes any presumption of pilot error that is raised by a grounding. *See Matheson v. Norfolk & North American Steam Shipping Co.,* 73 F.2d 177 (9th Cir.1934).

▮ The United States argues that failure to maintain the buoy on its charted position cannot be brought by Olympia on the basis of Fletcher's reliance on the buoy's charted position. Fletcher testified, however, that he did not need to use the charts because he had them in his mind. He maintained the usually appropriate distance off the buoy and used the range lights while in the turn. I conclude that although Fletcher did not consult the chart on March 8th, he did rely on the charted

position of the buoy. *See Burgess v. M/V Tamano,* 564 F.2d 964, 975 (1st Cir.1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978).

▮ The United States, alleging that the *Ypatia Halcoussi* violated numerous regulations,[19] asserts that the Pennsylvania Rule [20] applies, enlarging the burden that Olympia must carry to prevail. In light of my factual findings and the general nature of the regulations cited by the United States, I conclude that the Pennsylvania Rule is inapplicable. *See Afran Transport Co. v. United States,* 435 F.2d 213, 219 (2nd Cir.1970).

I conclude that the Coast Guard's negligent maintenance of Buoy No. 4 was the proximate and sole cause of the *Ypatia Halcoussi's* grounding. For reasons stated earlier in this opinion, I conclude that this action for negligence is founded upon the Suits in Admiralty Act.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

IT IS ORDERED that a time be set for trial on the issue of damages.

**19.** *See* Pretrial Order, Defendant's Contentions of Fact, (a)(1)–(4), a(11), a(13)–(15), and (b).

**20.** The "Pennsylvania Rule" originated in *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). The Court held that when a ship "is in actual violation of a statutory rule intended to prevent collisions" it is presumed that the fault was, if not solely on the violator, then at least partially so. The burden of proof given the plaintiff under the rule is to show that the plaintiff's violation (if any) could not have been a cause of the collision.