**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MANOUCHEHR MONAZZAMI
TAGHADOMI, Individually and as
Special Administrator of the Estate
of Nahid Davoodabadi, deceased;
THE ESTATE OF NAHID
DAVOODABADI; AHMAD
DAVOODABADI, Father of Nahid
Davoodabadi; KOBRA AHANGARY,
Mother of Nahid Davoodabadi,
   *Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,
   *Defendant-Appellee.*

No. 03-16129

D.C. No.
CV-01-00171-
ACK/KSC

OPINION

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted
December 8, 2004—San Francisco, California

Filed March 22, 2005

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

---

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

**COUNSEL**

Peter A. Schey, Los Angeles, California, argued the cause for the appellant; Teresa Tico, Hanalei, Hawaii, was on the briefs.

Philip Berns, U.S. Attorney's Office, San Francisco, California, argued the cause for the appellee; Peter D. Keisler, Assistant Attorney General, Edward H. Kubo, and Michael Chun,

U.S. Attorney's Office, San Francisco, California, were on the brief.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

In this tort claim against the federal government arising out of an accident at sea, we explore whether suit can be brought under the Suits in Admiralty Act, the Public Vessels Act, or the Federal Tort Claims Act.

### I

This case arises from an accident at sea.[1] Manouchehr Monazzami Taghadomi (a U.S. citizen) and his wife Nahid Davoodabadi (a citizen of Iran) rented a kayak during their honeymoon in Maui. Their boat was buffeted by harsh wind and waves, and Nahid was tossed overboard, attacked by a shark, and died. Monazzami washed up on an island and was stranded for three days before he was rescued. He was hospitalized for several days.

While the couple was still in the foundering kayak, a witness on land noticed it through his binoculars. Concerned, he telephoned the Coast Guard's Maui office and gave a description of the kayak and its location. About twenty minutes after receiving the call, the Maui office contacted the Coast Guard Operations Center in Honolulu. The Operations Center, in turn, contacted a Coast Guard cutter—the Kiska—and directed it toward the kayak. The Kiska conducted a brief

---

[1]Because we are reviewing a grant of summary judgment, we must consider the facts in the light most favorable to the non-moving party. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). The relevant facts are not in dispute for purposes of this appeal.

search, but darkness soon fell, and at about seven o'clock that evening the search was called off.

This lawsuit followed. Monazzami originally filed a complaint, individually and as special administrator of the estate of Nahid, against Extreme Sports Maui, the company that rented the kayak to Taghadomi. In subsequent amended complaints the estate and Nahid's parents were each added as separate plaintiffs and the United States was added as a defendant.[2] The plaintiffs (collectively, the "survivors") seek damages from the United States for wrongful death and emotional distress. They allege that the Coast Guard was negligent both in carrying out its rescue operation and in failing to contact local authorities who had access to better rescue equipment that might have been able to save the couple. The United States moved to dismiss or, in the alternative, for summary judgment. The survivors opposed the motion and also moved to amend their Complaint once again to clarify their claims against the United States. The district court granted the United States' motion for summary judgment, holding that the survivors' claims are not cognizable, and denied as futile the survivors' motion to amend. The court entered judgment for the United States and this appeal timely followed. We review the grant of summary judgment *de novo*. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002).

II

**[1]** The United States, of course, is liable in court only when it has waived its sovereign immunity. Three immunity-waiving statutes are relevant here. The first is the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674 *et seq.*, which generally renders the United States liable for its torts to the same extent as a private actor. The FTCA includes an exception, however, for "[a]ny claim for which a remedy is provided" by

---

[2]The plaintiffs have settled their dispute with Extreme Sports Maui, and the United States is the only remaining defendant.

either of the other two statutes relevant to this case. 28 U.S.C. § 2680. These are the Public Vessels Act ("PVA"), 46 U.S.C. App. § 781 *et seq.*, and the Suits in Admiralty Act ("SAA"), 46 U.S.C. App. § 741 *et seq.*

**[2]** The PVA renders the United States liable in admiralty for "damages caused by a public vessel of the United States."[3] 46 U.S.C. App. § 781. The PVA, however, contains a special reciprocity requirement that permits foreign nationals to sue the U.S. government only if their country of nationality would permit a similar suit by a U.S. citizen. 46 U.S.C. App. § 785.

**[3]** The SAA is broader: it renders the United States liable in admiralty in any case in which, "if a private person or property were involved, a proceeding in admiralty could be maintained." 46 U.S.C. App. § 742. It contains no reciprocity requirement. One might wonder why the PVA even exists, since the SAA appears to cover all admiralty claims, including those involving a public vessel. The answer lies in history. Until 1960 the SAA applied only to "merchant vessels," a category mutually exclusive of "public vessels." *See United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 167 n.1 (1976). For this and other reasons, admiralty lawyers preparing to file a claim were often uncertain which statute to file under—the PVA, the SAA, or in some cases the FTCA or the Tucker Act.[4] Congress solved the problem by amending the

---

[3]A "public vessel" is one owned or operated by the United States and used in a public capacity. *See In re United States and Mathiasen's Tanker Indus.*, 367 F.2d 505, 509 (3d Cir. 1966) ("[G]overnment ownership and use as directed by the government exclusively for a public purpose suffice without more to make a ship a public vessel."); *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 167 n.1 (1976) (holding a naval destroyer is a "public vessel" under the PVA).

[4]The Tucker Act applied to certain contract claims involving public vessels. The details of which statute applied in which situation are not relevant here. For a thorough explanation, see *Unifying Maritime Claims Against the United States*, 30 J. Mar. L. & Com. 41, 45-49 (1999).

SAA; one of the changes removed the reference to merchant vessels. *See United Cont'l Tuna*, 425 U.S. at 166-78.

The survivors cannot bring their claims under the PVA or the SAA, both because of the PVA's reciprocity requirement and because they failed to file within the applicable limitations periods under those statutes. They therefore seek, instead, to bring their claims under the FTCA.

A

The first question we must answer is whether the survivors' claims are maritime in nature—that is, whether they fall within federal admiralty jurisdiction. For the PVA and the SAA are relevant only to maritime claims and thus pose no obstacle to asserting non-maritime claims under the FTCA.

The survivors seek to bring two different claims against the United States. First, they claim that the Coast Guard cutter Kiska's search for the kayakers was negligently carried out (either by its crew or by land-based Coast Guard officers). We refer to this as the "negligent-search claim." Second, they claim that the two Coast Guard offices (in Maui and Honolulu) which knew about the kayak in distress negligently failed to contact the Maui Fire Department or any other local agency with access to a helicopter or other rescue vessels. We refer to this as the "failure-to-communicate claim."

No one disputes that the negligent-search claim is maritime in nature. The survivors argue, however, that the failure-to-communicate claim is not maritime and therefore not within the scope of the SAA or the PVA. Thus, they conclude, it is the proper subject of an action under the FTCA.

[4] A tort claim falls within the admiralty jurisdiction of the federal courts when two conditions are met. First, the tort must occur on or over navigable waters; this is the "locality" or "situs" test. *See Solano v. Beilby*, 761 F.2d 1369, 1370-71

(9th Cir. 1985); *Guidry v. Durkin*, 834 F.2d 1465, 1469 (9th Cir. 1987). Second, the actions giving rise to the tort claim must "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268 (1972). This is the "nexus" or "relationship" test. *See Solano*, 761 F.2d at 1371; *Guidry*, 834 F.2d at 1469. Admiralty jurisdiction exists only when both these requirements are satisfied.[5] *See Whitcombe v. Stevedoring Services of America*, 2 F.3d 312, 314 n.2 (9th Cir. 1993). The survivors contend that neither test is met here.

1

**[5]** With regard to the locality test, the survivors argue that because the Coast Guard's actions (or failure to act) took place entirely on land, the alleged negligence did not occur on navigable waters. This contention is unavailing, however, because it ignores the clear law of our circuit that the situs of a tort for the purpose of determining admiralty jurisdiction is the place where the injury occurs.[6] *See Solano*, 761 F.2d at 1371 (citing cases); *Guidry*, 834 F.2d at 1469; *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 256 (9th Cir. 1973) ("The locus of a tort is the place where injury takes effect.").

**[6]** *Solano* itself makes clear that this rule holds even when some of the negligent activity occurs on land. In *Solano*, two longshoremen were moving a Cadillac down a ramp onto a ship, when—because of the car's defective brakes—it began rolling out of control and caused a collision that injured both

---

[5]There is a narrow exception to the locality requirement for claims based on the plaintiff's "maritime status," but it is plainly not applicable here, and the survivors do not suggest otherwise. *See Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1307-08 (9th Cir. 1970) (noting that the maritime-status exception applies to claims for maintenance and cure as well as claims under the Jones Act).

[6]Indeed, we have occasionally characterized the first prong of the test for admiralty jurisdiction as simply requiring that "the *injury* occur on water." *E.g.*, *Whitcombe*, 2 F.3d at 315.

men. They brought an admiralty action against the marine cargo terminal which had stored the Cadillac, alleging that it negligently failed to inspect the car and warn the men of the defective brakes. *Id.* at 1370. We held that "[t]he injury . . . occurred on the ramp of a ship, satisfying the requirement of maritime locality." *Id.* at 1371. Notably, in a subsequent case we held that a suit against a cargo terminal operator for damage that occurred to cargo while *inside* the terminal was *not* within admiralty jurisdiction. *Whitcombe*, 2 F.3d at 314-15 ("[D]amage to cargo in the terminal operator's warehouse is jurisdictionally distinguishable from damage that occurs while loading the vessel."). It is clear, then, that the place of injury is the determinative factor. *See also Smith v. Lampe*, 64 F.2d 201, 202 (6th Cir. 1933) ("[W]here the negligent act orginates on land and the damage occurs on water, the cause of action is within the admiralty jurisdiction."); *In re Motor Ship Pacific Carrier*, 489 F.2d 152, 157 (5th Cir. 1974); 2 Am. Jur. 2d Admiralty § 75 ("For the purpose of determining admiralty jurisdiction, the tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action.").

**[7]** The survivors contend that the Supreme Court's decision in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), undermines the Ninth Circuit cases described above and supports the survivors' position. It does not. *Grubart* dealt with claims brought against the Great Lakes Dredge and Dock Company by plaintiffs whose buildings on land were damaged by a flood resulting from Great Lakes's allegedly faulty replacement of wooden bridge pilings in the Chicago River. *Id.* at 530-31. The Supreme Court held that the claims fell within federal admiralty jurisdiction. Its holding was explicitly based on the Admiralty Extension Act,[7] 46 U.S.C. App. § 740, which was enacted by Congress in 1948 and provides that

---

[7]This statute is sometimes referred to as the Extension of Admiralty Jurisdiction Act. *See, e.g., Gebhard*, 425 F.2d at 1306.

[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

*Id.*; *see Grubart*, 513 U.S. at 534-36. The AEA is a statute of inclusion, not exclusion: it merely extends admiralty jurisdiction to cover damage occurring on land but *caused* by vessels on navigable water. It has no application to this case, and the survivors do not contend otherwise. Nothing in *Grubart* hints at any modification of the traditional rule that the situs of a tort is the place of injury—and hence that tort claims based on injuries occurring on navigable water are within admiralty jurisdiction. In fact, the *Grubart* Court observed that "it is not apparent why the need for admiralty jurisdiction in aid of maritime commerce somehow becomes less acute merely because land-based parties happen to be involved." 513 U.S. at 545.

It is worth noting another line of cases which could erroneously be taken to support the survivors' argument. In *Guidry v. Durkin*, 834 F.2d 1465, 1469 (9th Cir. 1987), we held that the tort of defamation is cognizable in admiralty only when its *prima facie* elements occur at sea. *Id.* at 1470. Specifically, the *Guidry* court held that the publication of the defamatory material must occur at sea. *Id.*; *cf. Lamontagne v. Craig*, 632 F. Supp. 706, 708 (N.D. Cal. 1986) (holding that no admiralty jurisdiction existed over a defamation claim in which publication occurred on land). Similarly, in *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139 (9th Cir. 1995), we held that a claim for tortious interference with contract was not cognizable in admiralty when all of the *prima facie* elements—including damages—occurred on land. *Id.* at 143. It is clear, however, that our decisions in *Guidry* and *J. Lauritzen* were not propounding a general rule that any tort claim is within admiralty jurisdiction only when all of its *prima facie* ele-

ments occur at sea. Rather, they were concerned with defining the location at which *injury* is deemed to occur, in the context of defamation and tortious interference with contract—torts in which injury is often diffuse (or, in the case of defamation, sometimes presumed rather than proved). *See Guidry*, 834 F.2d at 1469 ("[S]itus of a tortious *injury* depends . . . on the type of tort alleged." (first emphasis added)). The survivors do not claim that the injuries occurred anywhere but at sea. Thus, the locality requirement is satisfied.

2

**[8]** We turn, then, to the nexus requirement. The survivors argue that the land-based Coast Guard's failure to communicate with the land-based Maui Fire Department is insufficiently related to maritime activity to support admiralty jurisdiction. The Supreme Court's opinion in *Grubart* describes the two relevant inquiries:

> The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved" to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."

*Grubart*, 513 U.S. at 534 (citations omitted). As to the first inquiry, the "type of incident involved" is to be considered at an "intermediate" level of generality. *Id.* at 538. In *Grubart*, for example, the Court described the incident (which specifically involved the faulty replacement of wooden pilings supporting bridges) as "damage by a vessel in navigable water to an underwater structure." *Id.* at 539. So described, the incident clearly posed a danger to maritime commerce.

**[9]** A corresponding description of the "type of incident involved" in this case would thus be something such as "in-

jury to boaters whose vessel capsizes at sea because of a potential rescuer's negligence in carrying out its rescue operation." One could quibble about precisely how to frame the question, but it is clear that at any reasonable level of generality the incident had a "potentially disruptive impact on maritime commerce." *See, e.g.*, *Polly v. Estate of Carlson*, 859 F. Supp. 270, 272 (E.D. Mich. 1994) ("That men were overboard in an emergency situation by itself is likely to disrupt commercial activity . . . ."). The efficacy of search-and-rescue operations has a direct effect on the health and lives of seamen. While the kayakers in this case were engaged in recreational and not commercial activity, there is no reason to regard that fact as relevant to the nature of the Coast Guard's activity, which would presumably have been the same no matter the purpose of the kayakers' excursion at sea. *Cf. Sisson v. Ruby*, 497 U.S. 358, 364 (1990) ("[T]he relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose."). Search-and-rescue operations also affect the vessels themselves: insofar as the rescuer can preserve the vessel, it prevents economic loss to the vessel's owner.

The second inquiry within the nexus test requires us to decide whether the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (internal quotation marks omitted). A preliminary question arises: what constitutes the "activity giving rise to the incident"? The survivors ask us to follow the path carved out in *Delta County Ventures, Inc. v. Magana*, 986 F.2d 1260 (9th Cir. 1993). That case dealt with a claim against the owner of a houseboat by a guest who dove off the boat, hit an object in the water, and was paralyzed. The guest sued the owner for negligently situating the boat. The owner asserted admiralty jurisdiction so it could invoke the Limitation of Liability Act, 46 U.S.C. App. § 183, to limit its liability to the value of the boat. We held that there was no admiralty jurisdiction because the "activity giving rise to the incident" had no relationship to traditional

maritime activity. We did so, however, because we conceived of the "activity" in question as the guest's diving into the water, and held that recreational diving has no relation to traditional maritime activity. *Id.* at 1262-63. It would be inappropriate, we held, to look past the immediate event surrounding the injury to a more remote cause such as the boat owner's negligent placement of the boat near an underwater object. *But see id.* at 1264 (Kozinski, J., dissenting).

**[10]** Were we bound by the approach of the *Delta County Ventures* majority, the survivors' argument might have some merit: the activity in question could be defined as recreational kayaking, which (arguably, though not obviously) does not bear a sufficient relationship to traditional maritime activity. But the *Delta County Ventures* approach is flatly inconsistent with the Supreme Court's subsequent decision in *Grubart* and hence is no longer good law. *Cf. Miller v. Gambie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that when a three-judge panel is faced with intervening precedent from a higher court that is "clearly irreconcilable" with a prior holding of this court, it is bound by the intervening authority). The Court held in *Grubart* that

> we need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will "involve" such traditional maritime activity and will meet the second nexus prong.

513 U.S. at 541. The activity at issue, then, is not merely the event immediately surrounding the injury; it is the behavior of any "putative tortfeasor[ ]" (here, the Coast Guard) that is an "arguably proximate cause[ ]" of the injury. In this case, then, the relevant question is whether the Coast Guard's search-and-rescue operation shows a substantial relationship to traditional maritime activity.

**[11]** It assuredly does. *See Berg v. Chevron U.S.A.*, 759 F.2d 1425, 1429 (9th Cir. 1985) ("The law of admiralty has always sought to encourage and induce men of the sea to go to the aid of life and property in distress." (citations and internal quotation marks omitted)); *Kelly v. United States*, 531 F.2d 1144, 1147 (2d Cir. 1976) ("[R]escue operations of the Coast Guard conducted on navigable waters do in fact bear a significant relationship to traditional maritime activities for purposes of admiralty jurisdiction."); *see also Sisson*, 497 U.S. at 367 ("The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial."). The Supreme Court emphasized in *Grubart* that the nexus test is not meant to exclude broad swathes of activity; it wrote approvingly of the notion that "virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction." 513 U.S. at 542.

**[12]** Thus, the locality test and both subprongs of the nexus test are satisfied in this case. It follows that all of the survivors' claims fall within federal admiralty jurisdiction.

B

We must next decide whether the survivors' claims can be brought under the FTCA despite their maritime nature. We consider their two claims separately. Because the negligent-search claim involves a public vessel within the meaning of the PVA, it must be analyzed under that statute. The failure-to-communicate claim, on the other hand, does not involve a public vessel, and so only the SAA will be relevant to its analysis.

1

The PVA provides:

> A libel in personam in admiralty may be brought against the United States, or a petition impleading the United States, for damages caused by a public vessel of the United States . . . .

46 U.S.C. App. § 781. The reference to "damages caused by a public vessel" is not limited to damages physically caused by the ship itself. Rather, it includes "cases where the negligence of the personnel of a public vessel in the operation of the vessel causes damage." *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 224-25 (1945).

[13] The parties do not dispute that the Coast Guard cutter involved in the search for Nahid and Monazzami is a public vessel within the meaning of the Act.[8] The survivors' negligent-search claim thus falls within the scope of the PVA.[9] Two of the survivors are citizens of Iran, however.[10] As the

---

[8]Indeed, every reported opinion we have found that has considered the matter has concluded that Coast Guard vessels are public vessels. *See Pascua v. Astrocielo Neptunea Armandora, S.A.*, 614 F. Supp. 984, 985 (D.C. Tex. 1985) ("A Coast Guard vessel is a public vessel within the meaning of the Act."); *Helgesen v. United States*, 275 F. Supp. 789, 790 (S.D.N.Y. 1966) (holding that "Coast Guard vessels are public vessels"); *Page v. United States*, 105 F. Supp. 99, 102 (E.D. La. 1952) ("Damages attributed to negligence of Coast Guard vessels and personnel may be recovered under this act."); *Olympia Sauna Compania Naviera, S.A. v. United States*, 604 F. Supp. 1297, 1301 (D.C. Or. 1984) (assuming without discussion that a Coast Guard cutter is a public vessel); *Cornell Steamboat Co. v. United States*, 138 F. Supp. 16, 17 (S.D.N.Y. 1956) (same); *Ladd v. United States*, 97 F. Supp. 80 (D.C. Va. 1951) (same). These decisions comport with the definition of a public vessel as a "vessel owned and used by a nation or government for its public service, whether in its navy, its revenue service, or otherwise." Black's Law Dictionary (8th ed. 2004).

[9]It is possible that the negligent-search claim falls outside the PVA to the extent that it involves the negligence of officials in the Coast Guard office on land rather than the crew of the Kiska. We need not limn the precise contours of the PVA, however, because the claims will turn out to be barred whether they arise under the PVA or not. *See infra*.

[10]We are aware of no reported decision squarely addressing the citizenship of a foreign decedent's estate under the PVA. *Cf. Blanco v. United*

survivors allege and the United States does not dispute, Iran's courts would not permit U.S. citizens to bring suit under similar circumstances. Thus, because of the PVA's reciprocity provision, the two non-citizen survivors cannot bring suit under the PVA.

[14] Nor may they bring the claim under the SAA. A literal reading of the SAA might permit such a suit, since the statute itself contains no reciprocity requirement and its language is broad:

> In cases where if [a vessel owned by the U.S.] were privately owned or operated, or if [cargo owned or possessed by the U.S.] were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States . . . .

46 U.S.C. App. § 742. The Supreme Court, however, held in *United States v. United Continental Tuna Corp.*, 425 U.S. 164 (1976), that a plaintiff whose claim falls within the scope of the PVA may not escape the PVA's reciprocity requirement by suing under the SAA. *Id.* at 181. The Court emphasized that to permit such a claim would "render nugatory the provisions of the Public Vessels Act." *Id.* at 178.

*United Continental Tuna*, however, did not involve the FTCA, and the survivors argue that they may still bring their claims under that statute. The FTCA provides:

*States*, 464 F. Supp. 927, 933 (S.D.N.Y. 1979) (holding that when a personal representative brings suit not for the benefit of the estate, but as a nominal plaintiff and trustee for the decedent's survivors, the relevant citizenship is that of the survivors). We assume, as the parties and district court have done, that Nahid's estate takes the American citizenship of Monazzami, its special administrator, for purposes of the PVA's reciprocity provision. If, instead, the estate retains Nahid's Iranian citizenship, our analysis of the non-citizen survivors' claim would apply to the estate as well. Since its claim is barred in either case, we need not resolve the issue.

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .

28 U.S.C. § 2674. The FTCA provides for several exceptions to this broad grant of liability, however, and one of them generally excludes claims remediable in admiralty:

The provisions of this chapter . . . shall not apply to—

. . .

(d) Any claim for which a remedy is provided by sections 741-752 [the SAA], 781-790 [the PVA] of Title 46, relating to claims or suits in admiralty against the United States.

28 U.S.C. § 2680. The United States argues that this provision bars the non-citizen survivors' claim. The non-citizen survivors contend that it does not, because as foreign nationals who cannot show reciprocity they have no "remedy" under the PVA or SAA. They argue, not unreasonably, that a literal reading of the statute's language would not bar their suit. The parties thus address the question of the FTCA's applicability as if it were chiefly a matter of interpreting § 2680's admiralty exception. But it does not matter who is correct, because the survivors' claim is barred for reasons unrelated to the FTCA's admiralty exception. The PVA of its own force bars their claim.

**[15]** The Supreme Court's decision in *United Continental Tuna* signaled that the PVA was not to be interpreted along purely textualist lines in its interaction with other statutes. The plain text of the PVA and the SAA, after all, would have allowed the plaintiffs in that case to avoid the PVA's reciprocity requirement by bringing their suit under the SAA. The Court did not permit such an evasion. Rather, it read the PVA

to require that any claim within its scope (that is, involving a public vessel) meet the reciprocity requirement, *regardless* of whether some other statute seemed on its face to permit suit without reciprocity. In *United Continental Tuna*, the other statute in question was the SAA. In this case, the survivors seek to use the FTCA for the same purpose. To permit them to do so, however, would be entirely inconsistent with the *ratio decidendi* if not the letter of *United Continental Tuna*, because it would "effectively nullify specific policy judgments made by Congress when it enacted the Public Vessels Act, by enabling litigants to bring suits previously subject to the terms of the Public Vessels Act under" the Federal Tort Claims Act. *United Cont'l Tuna*, 425 U.S. at 181.

[16] Thus, the survivors go astray in framing the issue as the interpretation of the FTCA's admiralty exception. In fact, *even if that exception to the FTCA did not exist*, the PVA would still prevent claims within its scope from being asserted under other statutes when the reciprocity requirement is not satisfied. Hence, those of the non-citizens survivors' claims which allege negligence relating to a Coast Guard vessel may not be brought under the FTCA or any other statute.[11]

---

[11]The plaintiffs who are U.S. citizens—Monazzami and, we assume, Nahid's estate, *see supra* note 10—cannot recover for the negligent-search claim under either the PVA or the SAA because that claim is time-barred by the statute of limitations for both statutes. The alleged negligence occurred on March 18, 1999, but Monazzami and Nahid's estate did not assert a claim against the United States until the second amended complaint was filed on January 29, 2002. *See* 46 U.S.C. App. § 745 (requiring claims under the SAA to be brought within two years); 46 U.S.C. App. § 782 (making the SAA's procedural provisions applicable to the PVA); *Aliotti v. United States*, 221 F.2d 598, 600 (9th Cir. 1955) (holding that the SAA's two-year statute of limitations applies to the PVA). Because the PVA or the SAA supplied a remedy, Monazzami and Nahid's estate may not bring the negligence claim under the FTCA. *See* 28 U.S.C. § 2680(d).

2

**[17]** We turn now to the claim by the survivors (both citizen and non-citizen) that the Coast Guard negligently failed to communicate with local authorities who might have provided superior rescue equipment. The PVA does not apply to this claim—since it does not involve a public vessel—and therefore neither does the PVA's reciprocity requirement. The survivors thus had a remedy for their failure-to-communicate claim under the SAA. (That remedy is no longer available because the statute of limitations lapsed before they filed their claim against the United States. *See* 46 U.S.C. App. § 745 (requiring claims under the SAA to be brought within two years).) The failure-to-communicate claim thus falls squarely within the FTCA's exception for "claim[s] for which a remedy is provided by [the SAA]"—even on the literal reading of this clause for which the survivors argue—and the district court was correct to conclude that they cannot bring it under the FTCA. *See T.J. Falgout Boats, Inc. v. United States*, 508 F.2d 855, 858 (9th Cir. 1974) (holding that a claim maintainable under the SAA but barred by the statute of limitations cannot be brought under the FTCA).

Since neither of the survivors' claims is cognizable under the FTCA, the district court was correct to grant summary judgment for the government.

**AFFIRMED.**