# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFF GRUVER,
          *Plaintiff-Appellant,*

          v.

LESMAN FISHERIES INC.; BOB
LESMAN; F/V SUNSET CHARGE,
Official Number 534685, in rem,
          *Defendants-Appellees.*

No. 05-35916

D.C. No.
CV-04-05428-RJB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted
March 7, 2007—Seattle, Washington

Filed June 6, 2007

Before: Diarmuid F. O'Scannlain and Marsha S. Berzon,
Circuit Judges, and Sam E. Haddon,* District Judge.

Opinion by Judge Berzon

*The Honorable Sam E. Haddon, United States District Judge for the
District of Montana, sitting by designation.

6829

## COUNSEL

John W. Merriam, The Law Office of John Merriam, Seattle, Washington, for the plaintiff-appellant.

Philip W. Sanford, Holmes Weddle & Barcott, Seattle, Washington, for the defendants-appellees.

## OPINION

BERZON, Circuit Judge:

This case raises the question whether a fight aboard a ship between a seaman and his former maritime employer over unpaid wages can give rise to federal admiralty jurisdiction. We find that it does and therefore reverse the district court's dismissal of the case for lack of subject matter jurisdiction.

## I.

Jeff Gruver worked as a deckhand for Lesman Fisheries, Inc. aboard the shrimp and crab boat F/V Sunset Charge ("the Sunset Charge") from May through June 2004. Robert Lesman[1] is the owner and captain of the Sunset Charge and was Gruver's direct supervisor during the time Gruver worked on the boat.

Gruver quit his job on the Sunset Charge in early June 2004 to begin working on a different fishing vessel, the F/V Adventurous ("the Adventurous"). At the time he left his job on the Sunset Charge, Gruver was owed some wages. Soon thereafter, Gruver angrily confronted Lesman at the dock, demanding his unpaid wages. Lesman mailed Gruver his final paycheck. While the check was in transit, Gruver called and

---

[1]We refer to all defendants as "Lesman" in this opinion.

left a threatening message on Lesman's voicemail. In the message, Gruver demanded the money and warned that he would hurt Lesman and damage the Sunset Charge if he was not paid. Lesman did not return the call, and Gruver received the final paycheck in the mail the next day. Unsatisfied with the amount of the check, Gruver again called Lesman and left a message threatening Lesman and his property if the full amount of wages owed to him was not paid.

Late in the night on June 18, 2004, Gruver was lying in his bunk on the Adventurous, waiting for the boat to leave for a pre-dawn trip to the fishing grounds.[2] Lesman boarded the Adventurous looking for Gruver. Lesman claims he was attempting to give Gruver a check for the remainder of his wages and that Gruver attacked him, resulting in a fight. Gruver, by contrast, claims that Lesman found Gruver asleep in his bunk and, with the help of Lesman's 380-pound nephew, beat Gruver severely, attempting to break his legs and vowing to kill him for leaving the threatening messages.

Gruver managed to escape to a neighbor's house on land, where he rang the doorbell and asked the man who answered to call an ambulance. Gruver suffered broken ribs and a punctured lung as a result of the fight. He had to be hospitalized for several days due to his injuries. Gruver later reported the incident to the police, and Lesman eventually was arrested.

On July 22, 2004, Gruver filed a complaint for damages in federal district court against Robert Lesman, Lesman Fisheries, Inc., and the Sunset Charge pursuant to admiralty and maritime law, citing 28 U.S.C. § 1333, 46 U.S.C. § 10602, and 45 U.S.C. § 56. The complaint charged Lesman with negligence and unpaid wages. Gruver thereafter filed an amended complaint on March 14, 2005, again predicated on admiralty jurisdiction, asserting causes of action for assault and unpaid wages. The parties later stipulated to the dismissal of the

---

[2] Gruver lived on the Adventurous at the time of the alleged assault.

wage claims, leaving only Gruver's negligence claim under maritime law[3] for Lesman's alleged assault.

Shortly thereafter, Lesman filed a motion to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. The district court granted the motion on August 29, 2005, holding that Gruver's suit must be dismissed because he had failed to establish federal admiralty jurisdiction. Gruver timely appealed the order.[4]

## II.

**[1]** We review de novo the district court's dismissal for lack of subject matter jurisdiction. *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 820 (9th Cir. 2005). Federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1); *see also* U.S. CONST. art. III, § 2. Historically, admiralty[5] jurisdiction turned

---

[3]Gruver stipulated that his claims regarding the assault were based on the general maritime law for negligence and not on the Jones Act.

[4]Gruver also appeals the district court's earlier denial of his motion for a declaration regarding the availability of punitive damages and of Lesman's motion for summary judgment on his *in rem* claim. While such non-final orders would ordinarily be unreviewable under 28 U.S.C. § 1291, we have "discretionary jurisdiction" to consider them on appeal, because the district court's judgment dismissing the case for lack of subject matter jurisdiction rendered the earlier denials final. *See Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 877 n.1 (9th Cir. 2002). We have repeatedly declined to exercise such discretion, however, "where . . . the final order in the case was a dismissal for lack of subject matter jurisdiction." *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992); *see also Burke v. Ernest W. Hahn, Inc.*, 592 F.2d 542, 546 n.3 (9th Cir. 1979); *Simons v. United States*, 497 F.2d 1046, 1048-50 (9th Cir. 1974). Because we remand to the district court for further proceedings, we decline to address the merits of the district court's denial of the *in rem* and punitive damages motions at this stage.

[5]We use the terms "admiralty" and "maritime" interchangeably, as the relevant caselaw often uses both words without apparent distinction. As one treatise explains, "the terms 'admiralty' and 'maritime law' are virtu-

solely on the question of whether the tort occurred on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995). Over time, however, the test has been refined. Today, a party seeking to invoke federal maritime jurisdiction over a tort claim must satisfy both a location test and a connection test.[6] *Id.* at 534.

**[2]** The location test focuses on "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* The connection test has two prongs, each of which must be met for admiralty jurisdiction to be proper: "A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce[.]" *Id.* (citation and internal quotation marks omitted). The second prong of the connection test requires us to examine "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* (internal quotation marks omitted).

**[3]** Neither the location test nor the first prong of the connection test are at issue in this appeal. The parties agree the location test is met because the alleged assault took place aboard the Adventurous while the ship was floating on navigable waters. *See id.* (holding location test may be satisfied by showing tort occurred on navigable water).

---

ally synonymous in this country today, though the first derives from the connection of our modern law with the system administered in a single English court, while the second makes a wider and more descriptive reference." GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 1-1 (2d ed. 1975).

[6]We have also referred to the "connection test" as the "nexus" or "relationship" test. *See Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir. 2005).

**[4]** The parties also agree that, with respect to the first prong of the connection test, the general features of the incident in question have the potential to disrupt commercial maritime activity. *See id.*; *see also Christensen v. Georgia-Pacific Corp.*, 279 F.3d 807, 815 n.31 (9th Cir. 2002) ("The commercial impact prong considers whether the general features of the incident could hypothetically have an effect on maritime commerce. It does not require that any impact actually occurred."). The incident in question, when properly defined at an "intermediate level of possible generality," *Grubart*, 513 U.S. at 538, involved an assault on a seaman by his former maritime employer aboard a vessel in navigable waters. *Cf. id.* at 539 (describing damage done by barge crane to underwater freight tunnel as "damage by a vessel in navigable water to an underwater structure"); *Sisson v. Ruby*, 497 U.S. 358, 363 (1990) (characterizing a fire caused by a defective washer/ dryer on a pleasure boat docked at a marina as "a fire on a vessel docked at a marina on navigable waters").

**[5]** As Lesman recognizes, resolving a disagreement with a crewmember through physical violence could render the crewmember unable to perform his fishing duties. *Cf. Grubart*, 513 U.S. at 539 (describing commercial impact prong as asking "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping"). Such a loss could delay or cause cancellation of scheduled fishing trips because of decreased manpower. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) (en banc) ("Without a doubt, worker injuries . . . can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel."). Further, if the ship had to fish with less crewmembers or with the loss of a key crewmember, it could decrease the number of fish the crewmen are able to catch. *Cf. Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 386 (7th Cir. 2001) ("The *City Lights I* was a commercial boat engaged in the transport of passengers for profit . . . , and without doubt an injury to one of its crew disrupts its participation in maritime commerce.").

Indeed, the detrimental effect on maritime commerce in this case was more than speculative: Gruver was hospitalized for days after the attack, depriving the Adventurous of its deckhand during scheduled fishing trips. Accordingly, the first prong of the connection test is met.

## III.

The jurisdictional dispute in this case, then, focuses on the second prong of the connection test: "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (internal quotation marks omitted). To warrant jurisdiction, the tortfeasor's activity must be "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply." *Id.* at 539.

As a first step, we must define what constitutes the "activity giving rise to the incident." *Id.* at 534. The analysis is complicated by the fact that the tort at issue in the case at bar does not comport with the typical maritime tort scenario, in which the tortfeasors are vessel owners engaging in some sort of maritime activity and where the vessel itself is directly implicated in the incident. *See, e.g.*, *id.* at 530 (concerning vessel that damaged underwater freight tunnel resulting in flooding to Chicago buildings); *Sisson*, 497 U.S. at 360, 363 (pertaining to marina fire caused by docked vessel's defective washer/dryer); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 (1982) (dealing with collision of passenger boats on navigable water). In such prototypical cases, the relevant activity for jurisdictional purposes has been defined with reference to the vessel itself. *Grubart*, 513 U.S. at 540 (repair or maintenance on navigable waterway performed from vessel); *Sisson*, 497 U.S. at 365 (storage and maintenance of vessel); *Foremost*, 457 U.S. at 675-77 & n.5 (navigation of vessels). Because this case involves an atypical factual scenario, it is not obvious what the relevant "activity giving rise to the inci-

dent" entails, since neither the Adventurous nor the Sunset Charge are directly implicated in the assault.

The district court made an admirable effort to discern the relevant activity in this unusual case. It identified two possibilities in this regard — the assault and the failure to pay wages due — before rejecting both as inadequate to sustain a maritime nexus. We first clarify that the district court misapprehended Supreme Court caselaw in entertaining the possibility that the assault could be the pertinent activity. We further hold that the district court correctly identified the failure to pay wages due as the relevant activity for the purposes of the connection test analysis, but that its conception of the scope of the wage dispute was too general. Defined in the manner *Grubart* dictates, Lesman's failure to pay Lesman for services rendered has a sufficient connection to traditional maritime activity. We therefore find admiralty jurisdiction exists and reverse the district court.

## A.

**[6]** We first reject the possibility that the assault could be the relevant activity for the purposes of the connection test's second prong. The parties and the district court confused the issue by conflating the relevant "incident," pertinent to the first prong of the nexus test, with the relevant "activity giving rise to the incident," which is the crux of the second prong of the test. *Grubart* illustrates by application, however, that such an approach is improper. 513 U.S. at 538-40 (dealing with "incident" and "activity giving rise to the incident" separately and at different stages of nexus test). A common sense reading of the Court's language supports the same conclusion, and we have found no case in which a court has determined that the tort and the activity giving rise to the tort are interchangeable for the purposes of the jurisdictional inquiry. Accord-

ingly, we reject the suggestion that the assault can be both the "incident" and the "activity giving rise to the incident."[7]

## B.

As an alternative to the assault, the district court also considered the possibility that Lesman's failure to pay wages owed is the relevant activity for the purposes of the maritime commerce comparison in the second prong of the connection test. We conclude that the district court was correct in considering the failure to pay wages as the relevant activity, but wrong in concluding that that circumstance does not meet the second prong of the connection test.

---

[7]Even assuming that the assault could be both the "incident" and the "activity giving rise to the incident," the cases Lesman and the district court rely on for the conclusion that such activity bears an inadequate relationship to traditional maritime activity are inapposite. The single case from our circuit cited, *Corrigan v. Harvey*, 951 F. Supp. 948 (D. Haw. 1996), concerned a fight between seamen on a dock. The district court in *Corrigan* found no admiralty jurisdiction existed because "all elements of the alleged tort occurred on land" and because the "[p]laintiff allege[d] nothing to distinguish this incident from an ordinary fight in the street." *Id.* at 952-53. Here, the assault occurred on a boat on navigable waters, and Gruver does allege facts indicating a link to maritime commerce, namely that the fight was over a claim of unpaid wages for services rendered aboard a commercial fishing boat.

In addition to *Corrigan*, Lesman relies on *Penton v. Pompano Constr. Co., Inc.*, 976 F.2d 636 (11th Cir. 1992), and *Hall v. Zambelli*, 675 F. Supp. 1023 (S.D. W. Va. 1988). As to the first case, the Eleventh Circuit has recognized that the relevant portion of *Penton* was effectively overruled by *Grubart*. *See Alderman v. Pac. N. Victor, Inc.*, 95 F.3d 1061, 1065 (11th Cir. 1996). *Hall* is no more helpful, as it relies on the exact same four-factor test the Supreme Court later rejected in *Grubart*. 513 U.S. at 543-48; *see also Sisson*, 497 U.S. at 365 (disapproving of similar multi-factor tests).

Because we conclude that the assault is not the relevant activity in this case, however, we decline to comment on whether assaults bear a "substantial relationship to traditional maritime activity," as required to satisfy the second step of the connection test's second prong. *See Grubart*, 513 U.S. at 534 (internal quotation marks omitted).

*Taghadomi v. United States*, 401 F.3d 1080 (9th Cir. 2005), guides our analysis. In *Taghadomi*, we rejected earlier Ninth Circuit precedent declaring it was "inappropriate . . . to look past the immediate event surrounding the injury to a more remote cause." *Id.* at 1087 (concluding *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260 (9th Cir. 1993), could not be reconciled with *Grubart*). *Taghadomi* made clear that, after *Grubart*, the relevant activity is "not merely the event immediately surrounding the injury [, but] the behavior of any 'putative tortfeasor[ ]' . . . that is an 'arguably proximate cause[ ]' of the injury." *Id.* at 1087 (second and fourth alterations in original) (quoting *Grubart*, 513 U.S. at 541); *see also Grubart*, 513 U.S. at 541 (noting that courts need only find that "one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor").

**[7]** Under the approach articulated in *Taghadomi*, the relevant activity in this case pertains to the wage dispute between Lesman and Gruver, which gave rise to the injurious incident. Lesman, the putative tortfeasor, withheld (rightfully or wrongfully) monies that Gruver felt he was owed for the services he had rendered on the Sunset Charge. By Lesman's own account of events, he boarded the Adventurous to confront Gruver about the wage dispute.[8] This "behavior" by Lesman precipitated the bloody fight on the Adventurous and is therefore properly considered a proximate cause of the assault.

---

[8]That Lesman's stated motivation in seeking out Gruver that night was to settle the wage feud is a key fact in our analysis. It convinces us that Gruver's threatening messages to Lesman were not a superseding intervening cause of the assault. *Cf. Farr v. NC Mach. Co.*, 186 F.3d 1165, 1169 (9th Cir. 1999) (defining superseding cause as " 'an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about,' " and intervening force as " 'one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.' " (emphasis omitted) (quoting RESTATEMENT (SECOND) OF TORTS §§ 440-441 (1965))).

Having identified the relevant activity, our next task is to determine how broadly or narrowly to characterize the wage dispute for the purposes of the comparison to "traditional maritime activity." *Grubart*, 513 U.S. at 534. This step is crucial, as the Supreme Court has recognized that "we might get a different result simply by characterizing the 'activity' in question at a different level of generality." *See id.* at 541-42.

**[8]** In framing the conduct, *Sisson* requires that we focus on the "general character of the activity," as examining the precise factual antecedents of the incident at issue would veer too close to an evaluation of the merits. Such evaluation is inappropriate at the jurisdictional stage. *See Sisson*, 497 U.S. at 364-365; *cf. id.* at 365 (avoiding commenting on cause of marina fire at issue by defining relevant activity as "the storage and maintenance of a vessel at a marina on navigable waters").

By the same token, however, we must reject the overly general characterization of the wage dispute the district court articulated. The district court considered whether Lesman's failure to pay wages was sufficiently maritime in nature to satisfy the second prong of the connection test.[9] The court concluded that it could not have, as the basic obligation to pay wages owed was not in any way specific to admiralty law and therefore did not bear a substantial relationship to traditional maritime activity.

---

[9]The district court's second reason for concluding the wage dispute could not be the relevant activity was that the parties had stipulated to the dismissal of the wage claims prior to the Rule 12(b)(1) motion. This point underscores our conclusion that the district court confused the tests for the first and second prongs of the connection test. While the district court was correct to conclude that the unpaid wages could not be the *incident* pertaining to the tort claim, there is no logical reason why the failure to pay wages could not be the *activity* giving rise to the incident — namely, the assault.

In framing the issue this way, the district court moved the camera too far back, thereby obscuring what is apparent from a more close-up shot of the incident: the maritime context surrounding the wage dispute. The Supreme Court has made clear that this approach is untenable. *Grubart*, 513 U.S. at 541-42 (recognizing that, while "a tortfeasor's activity can be described at a sufficiently high level of generality to eliminate any hint of maritime connection," such "hypergeneralization . . . would convert *Sisson* into a vehicle for eliminating admiralty jurisdiction").

**[9]** Given the Supreme Court's mandate to characterize the relevant activity generally, but not so generally as to ignore the maritime context, the relevant activity giving rise to the assault in this case is a failure to pay wages for maritime services performed aboard a commercial vessel. It is clear that paying seamen for their work at sea has a substantial relationship to traditional maritime activities. Indeed, the Supreme Court has recognized that the fundamental purpose of admiralty law is the protection of maritime commerce. *See Sisson*, 497 U.S. at 364 n.2 ("In *Foremost* [*Ins. Co. v. Richardson,* 457 U.S. 668 (1982)], the Court unanimously agreed that the purpose underlying the existence of federal maritime jurisdiction is the federal interest in the protection of maritime commerce, and that a case must implicate that interest to give rise to such jurisdiction."). The obligation of vessel owners and operators to pay workers for the services that enable such commerce is inextricably bound up in the "fundamental interest giving rise to maritime jurisdiction." *Id.* at 367.

This result is consistent with the Supreme Court's apparent approval of the notion that "virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime jurisdiction." *Grubart*, 513 U.S. at 542 (internal quotation marks omitted); *see also Taghadomi*, 401 F.3d at 1087 ("The Supreme Court emphasized in *Grubart* that the nexus test is not meant to exclude broad swaths of activity . . . ."). The generalization is particu-

larly apt where, as here, the tort in question occurred on navigable waters. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 109 (2d Cir. 1997) ("An important — although not necessarily determinative — consideration in ascertaining whether such a 'relationship' exists is whether the tort occurred on navigable waters.").

## IV.

[10] Because Gruver has satisfied both the location and connection tests, the district court erred in concluding that it lacked subject matter jurisdiction to hear this case. We therefore REVERSE and REMAND for further proceedings.