Bruce W. CHRISTENSEN, Plaintiff–Appellant,

v.

GEORGIA–PACIFIC CORPORATION, a Georgia corporation; Southern Route Maritime, S.A., a foreign corporation; Anglia Maritime, S.A., a foreign corporation, Defendants–Appellees.

No. 00–35922.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 9, 2001.

Filed Feb. 1, 2002.

---

Maureen Leonard, Portland, OR, for the plaintiff-appellant.

Jay W. Beattie, Lindsay, Hart, Neil & Weigler, LLP, Craig Murphy, Wood Tatum Saunders & Murphy, and Daniel F. Knox, Schwabe, Williamson & Wyatt, Portland, OR, for the defendants-appellees.

Before: HUG, T.G. NELSON, and GOULD, Circuit Judges.

T.G. NELSON, Circuit Judge.

Bruce W. Christensen appeals the district court's order granting Appellees' summary judgment motions. Christensen is a longshoreman who was injured while helping to retie a ship that had broken free from the dock. Christensen filed negligence claims against the ship, a second ship that had been tied to the same cleat on the dock, and the dock owner. The district court held that, as a matter of law, the injury was not a foreseeable result of appellees' acts. We reverse. Genuine issues of material fact exist as to breach of duty and proximate cause that must be resolved at trial.

## I.

Bruce Christensen worked as a longshoreman, or stevedore, in Coos Bay, Ore-

gon, when the incident from which this case arises occurred. On April 16, 1997, Asian Hawk, a ship owned by Appellee Southern Route Maritime, docked at the Glenbrook dock in Coos Bay. The ship was longer than the dock, so it tied its stern lines to a cleat on the adjoining dock owned by Appellee Georgia–Pacific. Asian Hawk hired long-shoremen, including Christensen, through a local stevedoring company to unload its cargo of nickel ore. When the ship arrived, it received weather reports alerting it to a forecast of high winds. Two days later, Western Condor, a ship owned by Appellee Anglia Maritime, arrived at the Georgia–Pacific dock and tied two mooring lines to the same Georgia–Pacific cleat to which Asian Hawk was tied.

On April 19, 1997, during a rainstorm with high wind gusts, the cleat holding the mooring lines of the two ships detached from the Georgia–Pacific dock. Christensen was sitting in his truck on his dinner break when the ship broke away from the dock and started drifting into Coos Bay. He went down to the dock, responding to yells for help from the ship's crew. He and another longshoreman helped tie one small line, and then several other long-shoremen arrived to help with the larger second line. The men lined up in a row to pull the ship's line across the dock to another cleat. Christensen injured his back while pulling on the line.

Christensen filed a negligence claim in state court against Southern Route Maritime for not monitoring its mooring lines and for allowing Western Condor to tie to the same cleat, and against Georgia–Pacific for allowing two ships to tie to the same cleat and for not properly constructing its

dock. Georgia–Pacific immediately removed the case to federal court on the basis of diversity and federal question jurisdiction.[1] Christensen later amended his complaint to include Anglia Maritime, claiming that the ship was negligent when it tied to the same cleat as Asian Hawk.

The district court granted Southern Route Maritime's motion for summary judgment. The court held that Southern Route Maritime owed no duty to Christensen. Alternatively, it held that even if a duty existed, Southern Route Maritime's negligent act did not proximately cause Christensen's injury. After this ruling, Christensen moved for reconsideration of the court's order, and the other two defendants moved for summary judgment. The court granted the motion to reconsider but did not change its decision. It also granted summary judgment in favor of Anglia Maritime and Georgia–Pacific, holding that their acts were also not proximate causes of Christensen's injury. Christensen appeals those decisions. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

II.

We review a district court's grant of summary judgment de novo.[2] We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.[3]

A. *Southern Route Maritime's Duty of Care*

▇▇ The Longshore and Harbor Workers' Compensation Act (LHWCA)

1. The federal question jurisdiction was based on the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950.

2. *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (en banc).

3. *Id.*

governs Christensen's claim against Southern Route Maritime. That act allows a longshoreman who is injured during the course of his employment to be compensated by his employer, the local stevedoring company.[4] The act also allows the longshoreman to bring an action against the owner of a vessel if that vessel's negligence caused the injury.[5] The act covers any person engaged in maritime employment.[6]

■■■ While Christensen can sue a vessel for negligence under the LHWCA, the Supreme Court has limited the duties that a vessel owner owes to the stevedores working for him or her.[7] Under *Scindia Steam Navigation Co. v. De Los Santos*,[8] a vessel owes three duties to its stevedores: the turnover duty, the active control duty, and the intervention duty.[9] The turnover duty is not at issue in this case.[10] The active control duty requires the vessel owner to act reasonably if it actively participates in the cargo operations, and to avoid exposing the stevedores to harm from hazards they may encounter in areas, or from equipment, under the active control of the ship.[11] The intervention duty requires the vessel owner to take some action if an unreasonably dangerous condition arises during the stevedoring operation that the vessel owner discovers and the stevedores could not be expected to remedy.[12] We hold that Southern Route Maritime did owe a duty to Christensen under the active control duty and the intervention duty.

■■■ [1] Christensen presented evidence that it was the custom of the maritime industry, and the practice of the Asian Hawk, to have the ship's crew assess the mooring conditions and loosen the lines as conditions changed.[13] In some cases, custom may be enough to establish a duty.[14] In this case, not only was it the

4. 33 U.S.C. § 904.

5. *Id.* § 905(b).

6. *Id.* § 902(3). Despite the fact that Christensen was not engaged in his usual duties of unloading cargo at the time of his injury, he is still covered by the LHWCA. The LHWCA covers persons whose employment requires them to spend at least part of their time doing longshoring operations. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 273, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). Coverage "does not depend upon the task which the employee was performing at the moment of injury." *Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137, 140 (9th Cir.1978); H. Rep. No. 98–570, at 3–4 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2734, 2736–37. Christensen was engaged as a stevedore and routinely worked at loading and unloading cargo from ships. Therefore, he is covered by the LHWCA.

7. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 172, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

8. *Id.*

9. *Id.* at 167, 175–76, 101 S.Ct. 1614; *See also Quevedo v. Trans–Pacific Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir.1998).

10. The turnover duty requires the ship owner to turn over the vessel to the stevedores in a safe condition and to warn them of any hidden hazards. There is no dispute that Southern Route Maritime turned over the ship in a safe condition because the Western Condor had not yet arrived.

11. *Scindia*, 451 U.S. at 167, 101 S.Ct. 1614.

12. *Id.* at 175–76, 101 S.Ct. 1614.

13. Such conditions may include high winds or the decreased weight of the ship as the cargo is unloaded. A reduction in weight causes the ship to ride higher in the water and subjects it to an increased sail effect from the wind pushing against the side of the ship, thereby creating a strain on the lines.

14. The language of *Scindia* suggests that custom alone can create a duty. 451 U.S. at 172, 101 S.Ct. 1614 ("absent contract provision, positive law, or custom to the contrary . . . the

custom of the maritime industry to have the ship's crew monitor the lines, but the Asian Hawk followed this practice. Thus, even after Southern Route Maritime turned over the ship to the stevedore company, it still retained the responsibility of checking and adjusting the mooring lines. That job never became the responsibility of the stevedores. For that reason, the lines constituted equipment under the active control of the ship. Therefore, under the custom of the industry and the practice of the Asian Hawk, Southern Route Maritime had a duty to exercise due care to avoid exposing the stevedores to hazards created by the mooring lines.

■ Alternatively, Southern Route Maritime had a duty to intervene when the weather and decreased weight of the ship created a strain on the lines. The crew of the vessel should have known there was a great strain on the lines, creating a dangerous situation, because it was responsible for monitoring the lines. The stevedores could not reasonably be expected to remedy the situation when they had no duty to inspect the lines (and therefore no knowledge of the condition of the lines) nor any control over the mooring of the ship. Therefore, Southern Route Maritime had a duty to intervene when the increasing strain on the lines created a dangerous situation.

Our conclusion concerning Southern Route Maritime's duty accords with a decision of the First Circuit. In *England v. Reinauer Transportation Co.,*[15] the First Circuit held that the vessel owed a duty to a longshoreman regarding the ship's mooring lines.[16] The court noted that the custom in the port of Boston was to have the ship's crew inspect and adjust the mooring lines before and during loading operations. It held that because of this custom, the ship had a duty to intervene when the lines became tight.[17] The court also held that the ship had an active control duty over the lines because there was evidence showing that the ship retained operational control over the lines and thus had a duty to inspect and adjust them.[18] This reasoning is valid, and we choose to follow it here.

■ Summary judgment is rarely granted in negligence cases because the issue of "[w]hether the defendant acted reasonably is ordinarily a question for the trier of fact."[19] That is the case here. There is a dispute of fact regarding whether Southern Route Maritime acted unreasonably by allowing the Western Condor to tie to the same cleat and whether the ship's crew actively monitored and adjusted the lines during the unloading process.[20]

shipowner has no general duty...."). *Accord England v. Reinauer Transportation Cos.,* 194 F.3d 265, 272 (1st Cir.1999) ("The plain language of *Scindia Steam* clearly suggests that custom alone is sufficient to create a duty owed by a vessel to a longshoreman."); *Keller v. United States,* 38 F.3d 16, 32 (1st Cir.1994) (stating that "post-'turnover' duty may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations ..."); *Kirsch v. Plovidba,* 971 F.2d 1026, 1031 (3d Cir.1992) (reciting *Scindia* language); *Spence v. Mariehamns R/S,* 766 F.2d 1504, 1507–08 (11th Cir.1985) (considering whether evidence of custom was sufficient to establish duty).

**15.** 194 F.3d 265.

**16.** *Id.* at 271–73.

**17.** *Id.* at 272.

**18.** *Id.* at 273.

**19.** *Martinez v. Korea Shipping Corp., Ltd.,* 903 F.2d 606, 609 (9th Cir.1990).

**20.** The record contains evidence from the Asian Hawk's captain that the crew did loosen the lines as the cargo was unloaded and that it was not unusual to have two ships tied to the same cleat. The record also contains evidence from Christensen's expert that it was

Therefore, the issue of whether Southern Route Maritime breached its duty of care cannot be decided on summary judgment. We reverse and remand.

### B. *Anglia Maritime and Georgia–Pacific's Duty of Care*

 The duty of care that Anglia Maritime owed to Christensen differs from that owed by Southern Route Maritime. Anglia Maritime owns a vessel which allegedly contributed to the cause of Christensen's injury. Although the LHWCA allows Christensen to sue Anglia Maritime for negligence,[21] the *Scindia* duties do not apply to Anglia Maritime because Christensen was not working on its ship.[22] Instead, a uniform federal standard of care applies. As stated in the legislative history of the 1972 amendments to the LHWCA,

[T]he Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall

be determined as a matter of Federal law.[23]

We held in *Peters v. Titan Navigation Co.*[24] that the duty a vessel owes a longshoreman under the LHWCA is a duty of reasonable care under the circumstances.[25] Such is the duty that Anglia Maritime owed to Christensen. Whether Anglia Maritime breached this duty is a factual question that must be submitted to the finder of fact.[26]

 Georgia–Pacific is not a vessel owner at all, so Christensen cannot bring an action against it under the LHWCA. A negligence claim against Georgia–Pacific may arise under either state law or general maritime law. To create a maritime tort, the incident must have occurred on navigable waters and have a maritime flavor.[27] An incident has maritime flavor if it has a potentially disruptive impact on maritime commerce and a substantial relationship to traditional maritime activity.[28]

 The tort involved in this case meets the requirements for a maritime tort. The injury is deemed to have oc-

---

customary to avoid mooring two large vessels to the same cleat and that the ship failed to take action to ensure that the vessel was safely moored.

**21.** The LHWCA allows a stevedore to sue any vessel that negligently causes an injury, whether the stevedore is working on that vessel or not. 33 U.S.C. §§ 905(b), 902(21).

**22.** *See Scindia*, 451 U.S. at 167, 101 S.Ct. 1614 (assessing duties of ship owed to stevedores carrying out cargo loading or unloading operations on that ship). *See also Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 534 (5th Cir.1991) (holding that *Scindia* does not apply to a vessel that has no relationship with the stevedore).

**23.** H. Rep. No. 92–1441, at 8 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4705.

**24.** 857 F.2d 1342 (9th Cir.1988).

**25.** *Id.* at 1344.

**26.** As noted in footnote 20, there is a dispute over whether it was reasonable for two ships to tie to the same cleat. There is also a lack of evidence regarding whether Southern Route Maritime gave Anglia Maritime permission to tie to that cleat. Christensen presented evidence that it is the practice of the industry to allow the first ship who ties to a cleat the right to deny permission to another ship to tie to the same cleat.

**27.** *Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

**28.** *Id.*

curred on navigable waters due to the Extension of Admiralty Jurisdiction Act.[29] The incident also had a maritime flavor. It had a potential to impact maritime commerce because it involved a commercial ship that was drifting into the bay.[30] The Asian Hawk itself could have been damaged, or it could have collided with and damaged another commercial vessel.[31] Even aside from the potential for a collision, a large ship adrift in the bay would restrict the navigational use of the waterway.[32] The incident was related to traditional maritime activity because the injury occurred while tying the ship's mooring lines to the dock.[33] Thus, the situation had a sufficient maritime nexus to be considered a maritime tort.

■ Like general negligence claims under the LHWCA, maritime negligence actions involve a duty of reasonable care.[34] Therefore, Georgia–Pacific owed the same duty to Christensen as did Anglia Maritime. Again, whether Georgia–Pacific

breached this duty is a question of fact for trial.[35]

## III.

■ After examining the duty and breach factors, we still must address the issue of causation. The district court held that, even assuming a duty and breach existed, Christensen had failed to provide sufficient evidence to establish that a question of fact existed regarding whether the appellees' acts caused his injury. The court concluded that Christensen's injury was not a foreseeable result of appellees' acts. We believe the district court erred in making such a conclusion as a matter of law.

■ As with the issue of breach, proximate cause is usually a factual decision that should be decided at trial.[36] As explained in another maritime case, proximate cause is a means of cutting off liability for consequences that are so far removed from the conduct at issue that there is no justification for imposing liability.[37]

29. 46 U.S.C. app. § 740. This act extends admiralty jurisdiction to incidents where the damage or injury was caused by a vessel on navigable water notwithstanding that the injury actually occurred on land, such as a dock or pier. The injury in this case was caused by a vessel on navigable water breaking free from a dock and needing to be retied. Therefore, it satisfies the location test of maritime torts. *See also Grubart*, 513 U.S. at 534, 115 S.Ct. 1043 (citing 46 U.S.C. app. § 740 when explaining the location test).

30. *See H2O Houseboat Vacations Inc. v. Hernandez*, 103 F.3d 914, 916 (9th Cir.1996) (noting that if houseboat had slipped its tie to the shore and drifted onto Lake Havasu, it would have posed a hazard to maritime commerce).

31. The commercial impact prong considers whether the general features of the incident could hypothetically have an effect on maritime commerce. It does not require that any impact actually occurred. *Grubart*, 513 U.S. at 538, 115 S.Ct. 1043.

32. *See id.* at 539, 115 S.Ct. 1043 (holding that damaging an underwater structure did have an effect on commerce because it led to restrictions on the navigational use of the waterway during the repair of the structure).

33. *See Sisson v. Ruby*, 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (holding that storing a vessel at a marina on navigable waters substantially relates to traditional maritime activity).

34. *Peters*, 857 F.2d at 1345.

35. The record contains no evidence regarding whether the dock owner has a responsibility to monitor how ships tie to the dock or whether the dock in question was improperly constructed.

36. *Martinez*, 903 F.2d at 609.

37. *Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1351 (9th Cir.1985).

Giving inferences to Christensen, there is at least a genuine issue of material fact as to whether Christensen's injury falls into this category.

 The situation that arose on the evening of April 19, 1997, was an emergency. The ship had broken free from the dock and was drifting into Coos Bay. Christensen responded to calls for help from the ship's crew and assisted in rescuing the ship. Under the rescue doctrine, which has long been recognized in tort law, the "foreseeable damages from a wrongful act include damages for the injuries sustained by one who seeks to rescue the person first endangered by that wrongful act." [38] Courts have applied the rescue doctrine to the rescue of property as well as people.[39] Because Christensen was trying to rescue the ship and the ship's crew, he falls within the doctrine. It was foreseeable that the emergency situation would call forth the rescue efforts of those in the area and that, in the course of the rescue attempt, a rescuer might be injured.

Appellees argue, and the district court held, that Christensen was not a foreseeable plaintiff because he was doing his normal work under normal conditions. They explain that it is not foreseeable that a worker will injure himself while doing his routine tasks. Even if this statement is true, a dispute of material fact exists as to whether Christensen was performing a routine task under normal conditions. Christensen offered evidence that he had not performed lines work since 1994 because of a previous back injury and that this particular occasion was the only lines work he did all year. He also offered evidence that the retying of the ship was not conducted under normal conditions.[40] Appellees' allegedly contrary evidence consisted of the fact that the stevedore company paid Christensen for the time spent retying the ship's lines. From this, Appellees argue that Christensen was doing his routine work. Appellees also submit that the retying of the ship was done in the usual way with the usual number of men. Because there is a dispute of material fact, we cannot say, as a matter of law, that Christensen was doing his normal work and that he was not acting as a rescuer. Therefore, the issue of proximate cause must be remanded for trial.

## CONCLUSION

Southern Route Maritime owed a duty to Christensen under *Scindia's* active control duty or intervention duty. Anglia Maritime and Georgia–Pacific owed a duty of reasonable care to Christensen. A genuine issue of material fact exists as to whether the three appellees breached their duties. There is also an issue of fact as to whether Christensen's injury was a foreseeable result of appellees' acts. Accordingly, we reverse the district court's grant

**38.** *Hanseatische Reederei Emil Offen Co. v. Marine Terminals Corp.*, 590 F.2d 778, 783 (9th Cir.1979). The rescue doctrine applies to this case because general principles of negligence law guide the federal courts in maritime tort cases. *Peters*, 857 F.2d at 1345 n. 1.

**39.** *Stewart v. Jefferson Plywood*, 255 Or. 603, 469 P.2d 783, 787 (1970) ("It is now fairly well established that one who is injured in an attempt to rescue another person's property which is endangered by defendant's negligence may recover for the injury.").

**40.** Christensen offered evidence that weather conditions were poor, the ship was at an odd angle to the dock, the tugboat originally called to help was not powerful enough to complete the job, and two other longshoremen who helped re-secure the ship called the situation an "emergency type of thing" and a "panic situation."

of summary judgment and remand for trial.

REVERSED and REMANDED.