Robert A. CABASUG and Joyce
C. Cabasug, Plaintiffs,

v.

CRANE COMPANY, et al., Defendants.

Civil No. 12–00313 JMS/BMK.

United States District Court,
D. Hawai'i.

July 25, 2013.

Amanda W. Halvorson, Alyssa R. Segawa, Diane T. Ono, Gary O. Galiher, Ilana Kananipiliokala Waxman, L. Richard Derobertis, Scott K. Saiki, Galiher Derobertis Ono, John H. Price, Michael A. Ragsdale, Cronin Fried Sekiya Kekina & Fairbanks, Honolulu, HI, Linda A. Monica, Portsmouth, NH, for Plaintiffs.

Geoffrey M. Davis, Daniel S. Hurwitz, K & L Gates LLP, Los Angeles, CA, Joseph F. Kotowski, III, Lee T. Nakamura, Tom Petrus & Miller LLLC, Steven K. Hisaka, Hisaka Stone Goto Yoshida Cosgrove & Ching, Wayne S. Sakamoto, Wayne S. Sakamoto, AAL, ALC, Ewing M. Martin, III, Mason Martin LLLC, Michael F. O'Connor, Ogawa, Lau, Nakamura & Jew, Donald C. Machado, Jr., Law Offices of Donald C. Machado Jr., Leah M. Reyes, Gallagher Kane Amai, Thomas R. Sylvester, Bickerton, Lee, Dang & Sullivan, Stephanie L. Marn, Weinberg Roger & Rosenfeld, Corlis J. Chang, John R. Lacy, Marissa Lei Lin Owens, Goodsill Anderson Quinn & Stifel LLLP, Judy A. Tanaka, Richard J. Kowen, Alston Hunt Floyd & Ing, Honolulu, HI, Brendan J. Tuohy, K & L Gates LLP, William Murray Hake, Nicolas P. Martin, Hake Law, Brent M. Karren, Carrie S. Lin, Cooley Manion Jones LLP, San Francisco, CA, Gregory R. Youman, K & L Gates LLP, Craig R. Waklser, Eckert Seamans Cherin & Mellott, LLC, Kyle E. Bjornlund, Lawrence G. Cetrulo, Cetrulo LLP, Boston, MA, James B. Insco, Michael J. Sechler, K & L Gates LLP, Pittsburgh, PA, Brady L. Green, Wilbraham Lawler & Buba P.C., Philadelphia, PA, David M. Katzenstein, Ekert Seamans

Cherin & Mellott, LLC, Newark, NJ, Christopher S. Marks, Sedgwick LLP, Seattle, WA, Timothy Edward Kapshandy, Sidley Austin, LLP, Chicago, IL, Robert O. Meriwether, Nelson Mullins Riley & Scarborough LLP, Columbia, SC, Douglas G. Wah, Khaled Taqi–Eddin, Foley & Mansfield, PLLP, Oakland, CA, Christopher O. Massenburg, Swetman Baxter Massenburg, LLC, New Orleans, LA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION TO APPLY THE SUBSTANTIVE LAW OF HAWAII, DOC. NO. 406

J. MICHAEL SEABRIGHT, District Judge.

## I. *INTRODUCTION*

On June 1, 2012, Plaintiffs Robert and Joyce Cabasug ("Plaintiffs") filed this action asserting claims for negligence, strict liability, breach of warranty, loss of consortium, and punitive damages against twenty-five Defendants that manufactured, sold and/or supplied various products containing asbestos to the United States Navy. As alleged in the Second Amended Complaint ("SAC"), Robert Cabasug ("Cabasug") was exposed to asbestos contained in Defendants' products while working as a pipefitter and nuclear engineer at the Pearl Harbor Naval Shipyard ("PHNS") from 1973 through 2006, causing him to develop mesothelioma and other asbestos-related diseases.

Currently before the court is Plaintiffs' Motion to Apply the Substantive Law of Hawaii, Doc. No. 406. Plaintiffs argue that Hawaii law, as opposed to admiralty law, applies to this dispute. Based on the following, the court DENIES Plaintiffs' Motion.

## II. *BACKGROUND*

### A. Factual Background

Cabasug worked at PHNS from 1973 through 2006, and held positions as a pipefitter; pipefitter limited; pipefitter journeyman; nuclear inspector, Code 139; General Engineer, Code 365; and Test Engineer and Risk Control. Plaintiffs asserts that he was exposed to asbestos up until 1986 when he was promoted to an office job. Doc. No. 406–1, Pls.' Mot. at 2.

Prior to this promotion, Cabasug asserts that he was exposed to asbestos within PHNS working on various ships and submarines under repair and inside Building No. 4 (Shop 56). *Id.* In total, Cabasug has identified thirty-eight ships and submarines that he worked on at PHNS, *see* Doc. No. 608–2, Ex. A, and asserts that he spent approximately seventy-five percent of his time on ships in drydock. *See* Doc. No. 608–3, Ex. 2 at 18.

On January 23, 2012, Cabasug was diagnosed with mesothelioma. Doc. No. 406–6, Pls.' Ex. D.

### B. Procedural Background

On June 1, 2012, Plaintiffs filed this action alleging claims for negligence, strict liability, breach of warranty, loss of consortium, and punitive damages against Defendants based on their manufacture, sale and/or supply of various products containing asbestos to the United States Navy.

On April 24, 2013, Plaintiffs filed their Motion to Apply the Substantive Law of Hawaii. Doc. No. 406. Defendants filed Oppositions on June 24–25, 2013, Doc. Nos. 608, 609, 610, 611, and Plaintiffs filed Replies on July 2, 2013. Doc. Nos. 613, 615. A hearing was held on July 23, 2013.

## III. *ANALYSIS*

The parties dispute whether Hawaii state law or admiralty law applies to Plain-

tiffs' tort claims stemming from Cabasug's exposure to asbestos while working at the PHNS shipyard.[1]

Whether admiralty law applies requires Defendants to meet two tests,[2] both of which must be met for admiralty law to apply—the location of the wrong (*i.e.*, the "location test"), and whether the wrong bears a significant relationship to traditional maritime activity (*i.e.*, the "connection test"). *See, e.g., Taghadomi v. United States*, 401 F.3d 1080, 1084 (9th Cir.2005). The parties dispute the relevant framework for the second inquiry, the connection test.[3]

Plaintiffs urge this court to apply the connection test as articulated in *Myhran v. Johns–Manville Corp.*, 741 F.2d 1119 (9th Cir.1984), and other cases in the 1980s that addressed the applicability of admiralty law to shipyard asbestos cases. *Myhran* determined that although the location test was met where plaintiff was exposed to asbestos products during the repair of vessels floating on navigable waters, the connection test was not met. *Myhran* came to this conclusion by considering four factors: "(1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injury suffered." *Id.* at 1121–22 (quoting *Owens–Illinois, Inc. v. U.S. Dist. Ct.*, 698 F.2d 967, 970 (9th Cir.1983) (per curiam)).

In comparison, Defendants argue that the factors considered in *Myhran* have been displaced by *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). In determining that maritime law applied to flooding of basements on the Chicago River caused by a vessel placing pilings on the shore, *Grubart* rejected the four-factor test outlined by *Myhran* and other cases, and instead focused the inquiry on whether (1) the incident has a potentially disruptive impact on maritime commerce; and (2) the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. *Id.* at 534, 115 S.Ct. 1043.

Thus, at issue is whether *Myhran*, whose facts closely parallel those presented in this action, governs the admiralty law analysis even though *Grubart* rejected this framework when presented with different facts. In other words, at issue is whether *Myhran* is still controlling law or has been overruled by *Grubart*. To resolve this dis-

---

1. Defendant Crane Company also argues that the court need not decide this issue before there is no conflict between maritime and Hawaii state law before the court. The parties' numerous dispositive motions pending before the court belie this contention.

2. Although Defendants have the burden of establishing that admiralty law applies, *see Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), Plaintiffs brought this Motion. At the July 23, 2013 hearing, the parties agreed that the issues were adequately briefed for the court to determine the issue.

3. Plaintiffs also argue that state law applies in light of 16 U.S.C. § 457, which provides that

"in any action brought to recover on account of injuries sustained in any national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State,] the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be." The court rejects that 16 U.S.C. § 457 applies to the admiralty law analysis. "The congressional decision to place under state laws such areas as national parks, which are carved from existing state territories and are subject to no other general body of law, carries no implication of a similar intent in the vastly different realm of admiralty." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

pute, the court outlines the development of the admiralty law test, determines whether *Myhran* informs the court's analysis in light of the current state of the admiralty law test, and then addresses the applicable framework to the facts of this case.

## A. Development of the Admiralty Law Test

The traditional test for determining whether admiralty law applied to a tort case was a simple, bright line locality test—if the tort occurred on navigable waters, "admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Grubart*, 513 U.S. at 531–32, 115 S.Ct. 1043. *See also Conner v. Alfa Laval, Inc.*, 799 F.Supp.2d 455, 461 (E.D.Pa.2011) (asbestos MDL action) (reciting historical development of admiralty law test). This test had limitations—"admiralty courts lacked jurisdiction over, say, a claim following a ship's collision with a pier insofar as it injured the pier, for admiralty law treated the pier as an extension of the land." *Grubart*, 513 U.S. at 532, 115 S.Ct. 1043. As a result, in 1948 Congress enacted the Extension of Admiralty Jurisdiction Act, to clarify that admiralty jurisdiction includes "all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C.App. § 740 (1948) (current version at 46 U.S.C. § 30101).

After this statutory change, *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), revisited the admiralty law test and rejected that location is the sole criterion for admiralty jurisdiction. *Executive Jet*

involved tort claims stemming from an airplane crash into Lake Erie after it collided with a flock of birds. Although the accident occurred on navigable waters, *Executive Jet* reasoned that a tort such as an airplane accident is not cognizable in admiralty unless "the wrong bear[s] a significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. 493. The Supreme Court subsequently clarified that "the *Executive Jet* requirement that the wrong have a significant connection with traditional maritime activity is not limited to the aviation context." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). Thus, under *Executive Jet* and *Foremost Insurance*, the admiralty law test required courts to consider both the location of the wrong (*i.e.,* the "location test") and whether the wrong bears a significant relationship to traditional maritime activity (*i.e.,* the "connection test").

*Executive Jet* and *Foremost Insurance* did not provide much guidance as to how courts should determine whether the connection test was met. As a result, circuits developed various multi-factor tests to analyze this inquiry. The Ninth Circuit adopted four factors: "(1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; and (4) the causation and nature of the injury suffered." *See Myhran*, 741 F.2d at 1121–22 (quoting *Owens–Illinois*, 698 F.2d at 970). The Ninth Circuit applied these factors in a variety of circumstances to determine whether admiralty law applied, including in the asbestos context.[4] For example, *Myhran* involved a

---

4. Examples not involving asbestos torts include: *Complaint of Paradise Holdings, Inc.*, 795 F.2d 756, 759 (9th Cir.1986) (applying factors to determine admiralty law applied to action arising out of death of body surfer in propeller of a cruise ship); *Solano v. Beilby*, 761 F.2d 1369, 1371 (9th Cir.1985) (applying

factors to determine admiralty law applied to action brought by longshoremen who were injured while loading a car onto a vessel); and *T.J. Falgout Boats, Inc. v. United States*, 508 F.2d 855, 857 (9th Cir.1974) (adopting four-factor test to determine that admiralty law applies to action for damage to privately

pipefitter who was exposed to asbestos-containing products while repairing and renovating vessels on navigable waters. *Myhran* determined that while the locality test was met, the connection test was not met because none of the factors suggested that the wrong bore a significant relationship to traditional maritime activity. *Id.* at 1122; *see also Owens–Illinois*, 698 F.2d at 970.[5]

After *Myhran* and other circuits developed various multi-factor tests, the Supreme Court provided some clarification in *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). *Sisson* addressed whether admiralty law applied where a fire on a pleasure boat docked at a marina caused damage to the boat, other boats docked nearby, and the marina. Because the location test was clearly met, the dispute centered on the connection test. *Sisson* focused on two factors to find that the connection test was met. First, the burning of docked boats at a marina on navigable waters was of a sort "likely to disrupt [maritime] commercial activity." *Id.* at 363, 110 S.Ct. 2892. Second, "the storage and maintenance of a vessel . . . on navigable waters" bore a substantial relationship to "traditional maritime activity." *Id.* at 366–67, 110 S.Ct. 2892.

In outlining these two inquiries for the connection test, *Sisson* recognized that circuit courts had developed various multi-factor inquiries, such as *Myhran's* four-factor inquiry. *Id.* at 365 n. 4, 110 S.Ct. 2892. *Sisson* nonetheless left unresolved whether these multi-factor tests would apply under circumstances not presented in *Sisson*. Rather, *Sisson* explained that "at least in cases in which all of the relevant entities are engaged in similar types of activity (cf. n. 3, supra),[6] the formula initially suggested by *Executive Jet* and more fully refined in *Foremost* and in this case provides appropriate and sufficient guidance to the federal courts." *Id.*

After *Sisson*, courts were left guessing whether *Sisson's* connection test applies under different facts. For example, in *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1263 (9th Cir.1993), a houseboat guest sued the owner for his injuries sustained when he dove off the boat and struck and underwater object. *Delta Country Ventures* determined that

---

owned vessel that was struck by a Navy missile).

**5.** Many other circuits, applying similar multi-factor connection tests, also determined that state law applies to shipyard asbestos tort actions. *See, e.g., Cochran v. E.I. duPont de Nemours*, 933 F.2d 1533, 1538–39 (11th Cir. 1991); *Eagle–Picher Indus. v. United States*, 846 F.2d 888, 896–97 (3d Cir.1988); *Petersen v. Chesapeake & Ohio Ry. Co.*, 784 F.2d 732, 736 (6th Cir.1986); *Oman v. Johns–Manville Corp.*, 764 F.2d 224, 230–32 (4th Cir.1985) (en banc); *Woessner v. Johns–Manville Sales Corp.*, 757 F.2d 634, 649 (5th Cir.1985); *Austin v. Unarco Indus.*, 705 F.2d 1, 11–14 (1st Cir.1983); *Keene Corp. v. United States*, 700 F.2d 836, 845 (2d Cir.1983).

**6.** In its footnote 3, *Sisson* explains:
In this case, all of the instrumentalities involved in the incident were engaged in a similar activity. The *Ultorian* and the other

craft damaged by the fire were docked at a marina, and the marina itself provided docking and related services. The facts of *Executive Jet* and *Foremost* also reveal that all the relevant entities were engaged in a common form of activity. *See Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (entities involved in the incident were engaged in nonmaritime activity of facilitating air travel); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (entities were both engaged in navigation). Different issues may be raised by a case in which one of the instrumentalities is engaged in a traditional maritime activity, but the other is not. Our resolution of such issues awaits a case that squarely raises them.
497 U.S. at 365 n. 3, 110 S.Ct. 2892.

admiralty law did not apply, relying largely on the four-part connection test, except for one change. Specifically, *Delta Country Ventures* joined other circuits "in holding that the four-part [connection] test is still valid, except for the fourth factor's causation inquiry, which is precluded by *Sisson,* 497 U.S. at 364–65, 110 S.Ct. at 2897." *Id.*

After *Delta Country Ventures, Grubart* squarely addressed the reach of *Sisson.* In *Grubart,* a crane on a barge in the Chicago River was used to drive new pilings into the riverbed and allegedly caused flooding to the basements of several buildings. Petitioners opposed application of *Sisson* given that all the parties involved were not engaged in similar activity, instead arguing that the Supreme Court should apply the same multi-factor test used in *Myhran.*[7] 513 U.S. at 544, 115 S.Ct. 1043. Petitioners argued that such a multi-factor test "would minimize, if not eliminate, the awkward possibility that federal admiralty rules or procedures will govern a case, to the disadvantage of state law, when admiralty's purpose does not require it." *Id. Grubart* found this argument unpersuasive, explaining that "the *Sisson* tests are aimed at the same objectives invoked to support [the] multifactor test—the elimination of admiralty jurisdiction where the rationale for the jurisdiction does not support it." *Id.* at 544–45, 115 S.Ct. 1043. *Grubart* explained that the *Sisson* test "reflects customary practice in seeing jurisdiction as the norm when the tort originates with a vessel in navigable waters, and in treating departure from the locality principle as the exception." *Id.* at 547, 115 S.Ct. 1043. In comparison, the multi-factor test "would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument

in a trial court and a virtually inevitable appeal." *Id.* Thus, *Grubart* held that the *Sisson* framework applies equally to cases in "where all of the relevant entities are engaged in similar types of activity" as well as cases "involving land based parties and injuries." *Id.* at 543–44, 115 S.Ct. 1043.

*Grubart* outlined that under this framework, "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Id.* at 534, 115 S.Ct. 1043. Under the location test, the court must determine "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* Under the connection test, the court must address two issues:

> A court, first, must "assess the general features of the type of incident involved," [*Sisson* ], 497 U.S. at 363, 110 S.Ct. at 2892, to determine whether the incident has "a potentially disruptive impact on maritime commerce," *id.,* at 364, n. 2, 110 S.Ct. at 2896, n. 2. Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." *Id.* at 365, 364, and n. 2, 110 S.Ct., at 2897, 2896, and n. 2.

*Id.*

Since *Grubart,* the Ninth Circuit has applied the *Sisson/Grubart* framework to a number of different circumstances. *See, e.g., In re Mission Bay Jet Sports, LLC,* 570 F.3d 1124, 1128 (9th Cir.2009) (applying *Grubart* to jetski accident to determine that admiralty law governs); *Gruver v. Lesman Fisheries Inc.,* 489 F.3d 978, 982

---

**7.** *Myhran's* four-factor connection test was identical to the Seventh Circuit test under

review by *Grubart. See Grubart,* 513 U.S. at 544, 115 S.Ct. 1043.

(9th Cir.2007) (applying *Grubart* to an employer's assault on a crewman on a fishing vessel to determine that admiralty law governs); *Taghadomi,* 401 F.3d at 1087 (applying *Grubart* to determine that admiralty law applied to tort action brought against the Coast Guard for alleged negligence in search and rescue of recreational kayakers, and rejecting analysis in *Delta Country Ventures* ); *H2O Houseboat Vacations Inc. v. Hernandez,* 103 F.3d 914, 916 (9th Cir.1996) (applying *Grubart* to determine that emission of carbon monoxide fumes inside contained space within houseboat tied to shore had no potential to disrupt maritime commerce).

### B. Whether *Myhram* Still Informs the Admiralty Law Framework

Based on this history, the court can now answer the question raised by the parties—whether, in light of *Sisson* and *Grubart, Myhran* still informs the court's analysis of whether admiralty law applies to this asbestos shipyard tort action.

The court finds that in light *Grubart's* specific rejection of the four-factor test and the subsequent caselaw applying the *Sisson* framework, the multi-factor connection test applied in *Myhran* has been effectively overruled by *Sisson* and *Grubart.* *See Miller v. Gammie,* 335 F.3d 889, 893 (9th Cir.2003) (en banc) (holding that only when "the reasoning or theory of . . . prior

circuit authority is clearly irreconcilable" with subsequent changes in law should a court "reject the prior circuit opinion as having been effectively overruled"); *see also McClenahan v. Paradise Cruises, Ltd.,* 888 F.Supp. 120, 123 (D.Haw.1995) (determining that *Grubart* overruled the multi-factor Ninth Circuit test for the connection test such that the district court is not bound by those earlier decisions).[8] Indeed, since *Grubart,* courts addressing whether admiralty law applies to shipyard asbestos tort cases—including the asbestos multi-district litigation ("MDL") court[9]— have applied *Grubart.* *See, e.g., Conner,* 799 F.Supp.2d at 464 (MDL action); *Faddish v. Buffalo Pumps,* 881 F.Supp.2d 1361, 1366–68 (S.D.Fla.2012); *Stevens v. CBS Corp.,* 2012 WL 5844704, at *2 (W.D.Wash. Nov. 19, 2012); *John Crane, Inc. v. Jones,* 274 Va. 581, 650 S.E.2d 851, 853 (2007); *see also Lambert v. Babcock & Wilcox, Co.,* 70 F.Supp.2d 877, 883 (S.D.Ind.1999) (applying *Grubart* to asbestos tort action brought by family of individual who worked aboard Navy ship). The court agrees and joins these decisions. The court will therefore use the *Sisson/Grubart* framework to determine whether state or admiralty law applies.

Beyond *Myhran's* four-factor test, however, Plaintiffs argue that *Myhran* is still good law for its overall determination that asbestos exposure during construction

---

**8.** Plaintiffs cite to *Lozman v. City of Riviera Beach,* —— U.S. ——, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013), as indicating that the Supreme Court limits application of admiralty law and would reject its application to shipyard workers. *See* Doc. No. 406–1, Pls.' Mot. at 11. *Lozman* offers Plaintiffs no support. In *Lozman,* the city of Riviera Beach brought a federal admiralty lawsuit seeking to evict Lozman's house-like plywood floating structure from Riviera Beach's marina. *Lozman* determined that the floating home was not a "vessel" such that admiralty law did not apply. 133 S.Ct. at 741–44. Unlike in *Lozman,*

there is no dispute that Cabasug worked on ships that traveled on navigable waters.

**9.** The Judicial Panel on Multidistrict Litigation, in ceasing the transfer of tag-along actions to the asbestos MDL, stated that "the judges presiding over [the actions that will now be no longer transferred to the MDL] will almost certainly find useful guidance in the many substantive and thoughtful rulings that have been issued during the lengthy course of the Multi district proceedings." *In re Asbestos Prods. Liability Litig.,* 830 F.Supp.2d 1377, 1379 (U.S.Jud.Pan.Mult.Litig.2011).

and/or repair of Navy ships does not bear a significant relationship to traditional maritime activity, which is the second inquiry of the connection test under the *Sisson/Grubart* framework. *See* Doc. No. 613, Pls.' Reply at 11–13. Plaintiffs reason that *Myhran* is directed to the same objective as *Sisson* and *Grubart* of "eliminat[ing] admiralty jurisdiction where the rationale for the jurisdiction does not support it," *see Grubart,* 513 U.S. at 544–45, 115 S.Ct. 1043, such that *Myhran's* determination that there is no policy rationale to support admiralty jurisdiction in the asbestos context survives *Grubart* and informs the second connection test inquiry.

Plaintiffs' argument ignores that although *Myhran* was directed to the same objective as *Sisson* and *Grubart,* its inquiry in reaching this objective is totally different—*Myhran* determined that asbestos exposure during Navy ship construction does not bear a significant relationship to traditional maritime activity based on the very four-factor test that *Grubart* rejected. *Myhran* explained that admiralty law did not apply to this shipyard asbestos action because (1) admiralty law is not concerned with asbestos tort claims where it involves the same issues that are presented in purely state law action; (2) the plaintiff's function and role as a pipefitter in a shipyard does not fall within the traditional concerns of admiralty where he was not a seaman and did not perform the work of a seaman; (3) the involvement of ships was at most tangential given that the plaintiff would be in the same position had his asbestos exposure occurred during construction of ships on land; and (4) exposure to asbestos does not bear any inherent relationship to maritime activity. 741 F.2d at 1122–23.

*Myhran's* weighing of these detailed and specific facts is the very problem *Grubart* found with the four-part test—that it is "hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument in a trial court and a virtually inevitable appeal." 513 U.S. at 547, 115 S.Ct. 1043. In comparison, the second connection test of the *Sisson/Grubart* framework asks whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. *Id.* at 534, 115 S.Ct. 1043. The focus is "on the 'general character of the activity,'" as opposed to the "precise factual antecedents of the incident at issue," which *Myhran* weighed in its analysis. *See Gruver,* 489 F.3d at 985 (quoting *Sisson,* 497 U.S. at 364–65, 110 S.Ct. 2892).[10]

Thus, *Myhran* and *Grubart* are at odds, and the court is not bound by *Myhran's* determination regarding whether shipyard asbestos actions are substantially related to traditional maritime activity. *See Gammie,* 335 F.3d at 899 ("[C]ircuit precedent, authoritative at the time it was issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent.") (quoting *Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119, 1123 (9th Cir. 2002)). The court therefore does not rely on *Myhran* in determining whether admiralty law applies to this action.

**C. Application of the *Sisson/Grubart* Framework**

■ The court applies the the *Sisson/Grubart* framework to determine whether admiralty law applies to this ac-

---

10. As the Supreme Court recognized in *Grubart,* "we might get a different result simply be characterizing the 'activity' in question at a different level of generality." 513 U.S. at 541–42, 115 S.Ct. 1043.

tion. As explained above, under the location test, the court must determine "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043. Under the connection test, the court must (1) " 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce,' " *id.* (quoting *Sisson*, 497 U.S. at 363, 364 n. 2, 110 S.Ct. 2892); and (2) "determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.' " *Id.* (quoting *Sisson*, 497 U.S. at 365, 364 n. 2, 110 S.Ct. 2892).

### 1. Location Test

 Under the location test, the court must determine "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 543, 115 S.Ct. 1043. District courts since *Grubart* have determined that "in the case of asbestos-related disease arising from work on or around ships ... the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters." *See Conner*, 799 F.Supp.2d at 466. In comparison, "work performed in other areas of the shipyard or on a dock, (such as work performed at a machine shop in the shipyard, for example ...) is land-based work." *Lewis v. Todd Shipyard Corp.*, 2013 WL 1880792, at *1 n. 1 (E.D.Pa. Apr. 4, 2013); *see also Faddish*, 881 F.Supp.2d at 1367 (citing *Conner*).

Cabasug was exposed to asbestos while working on vessels in drydock at PHNS. It is well-settled that vessels in drydock are still considered to be in "navigable waters" for purposes of admiralty jurisdiction.[11] Indeed, during the July 23, 2013 hearing, Plaintiffs' counsel conceded that the locality test has been met. Thus, the court addresses the connection test.

### 2. Connection Test

#### a. *Whether the incident has a potentially disruptive impact on maritime commerce*

 This inquiry "turns ... on a description of the incident at an intermediate level of possible generality," requiring the court to ask "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 538–39,

---

11. *See, e.g., Simmons v. The Steamship Jefferson*, 215 U.S. 130, 142, 30 S.Ct. 54, 54 L.Ed. 125 (1909) ("In reason, we think it cannot be held that a ship or vessel employed in navigation and commerce is any the less a maritime subject within the admiralty jurisdiction when, for the purpose of making necessary repairs to fit her for continuance in navigation, she is placed in a dry dock and the water removed from about her, than would be such a vessel if fastened to a wharf in a dry harbor, where, by the natural recession of the water by the ebbing of the tide, she for a time might be upon dry land."); *The Robert W. Parsons*, 191 U.S. 17, 34, 24 S.Ct. 8, 48 L.Ed. 73 (1903) ("[A]s all serious repairs upon the hulls of vessels are made in drydock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs. No authorities are cited for this proposition, and it is believed that none such exist."); *see also Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 299 (2d Cir.2009) ("[A] ship in a 'graving' or 'graven' dock is still in 'navigable waters' for purposes of federal admiralty jurisdiction even though water may have been temporarily removed."); *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348–49 (11th Cir.1994) (concluding that a ship in a dry dock is "in or on navigable waters for purposes of admiralty jurisdiction"); *Deuber v. Asbestos Corp. Ltd.*, 2011 WL 6415339, at *1 n. 1 (E.D.Pa. Dec. 2, 2011) (determining that locality test was met where plaintiff worked on drydock, which is sea-based work).

115 S.Ct. 1043; *see also Taghadomi*, 401 F.3d at 1086 ("As to the first inquiry, the 'type of incident involved' is to be considered at an 'intermediate' level of generality."). Thus, this inquiry "considers whether the general features of the incident could hypothetically have an effect on maritime commerce. It does not require that any impact actually occurred." *Christensen v. Georgia–Pacific Corp.*, 279 F.3d 807, 815 n. 31 (9th Cir.2002); *see also Grubart*, 513 U.S. at 538, 115 S.Ct. 1043 (explaining that this inquiry goes to "potential effects, not to the particular facts of the incident"). Since *Sisson* and *Grubart*, the Ninth Circuit has "taken an inclusive view of what general features of an incident have a potentially disruptive effect on maritime commerce." *In re Mission Bay Jet Sports, LLC*, 570 F.3d at 1128.

A description of the "type of the incident involved" in this case is something along the lines of "injury to workers on Navy ships on navigable waters allegedly caused by defective parts" or "exposure to allegedly defective products on or around Navy ships on navigable waters." However defined, it is clear that the incident involves injury on Navy ships. Given these descriptions, "at any reasonable level of generality the incident had a 'potentially disruptive impact on maritime commerce.'" *See Taghadomi*, 401 F.3d at 1086. As explained in the MDL asbestos case *Conner*, such incident could disrupt maritime commerce a number of ways:

> [E]xposure to defective products creates unsafe working conditions that could cause labor shortages on the ships due to injuries sustained aboard. *See Lambert*, 70 F.Supp.2d at 884. And a shortage of this nature "could be exacerbated by fear of exposure by crew members and potential crew members alike." *Id.* Any such occurrence would disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so.

799 F.Supp.2d at 467–68 (footnote omitted); *See also Lambert*, 70 F.Supp.2d at 883–84 (providing similar reasons). The court agrees with this reasoning.

In opposition, Plaintiffs argue that the use of asbestos-containing parts on Navy ships provides no more than a fanciful risk to commercial shipping given that the Navy does not engage in maritime commerce and the effects of asbestos exposure take decades and impact only a small percentage of exposed persons. *See* Doc. No. 613, Pls.' Reply at 8. The court rejects this argument.

■ As an initial matter, the analysis is not limited to whether the vessels at issue (Navy ships) themselves participated in maritime commerce. Rather, the relevant inquiry is "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 538–39, 115 S.Ct. 1043. Indeed, as *Foremost Insurance* explains:

> The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually engaged in commercial maritime activity. This interest can be fully vindicated only if all operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce. For example, if [ ] two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity.

457 U.S. at 674–75, 102 S.Ct. 2654. As stated above, the incident at issue in this case—injury to workers on Navy ships on

navigable waters allegedly caused by defective parts—has the potential to disrupt ships engaged in maritime commerce. *See also Conner,* 799 F.Supp.2d at 467 n. 13 (rejecting argument that Navy ships do not affect maritime commerce). Indeed, beyond the protection of shipping lanes, Navy vessels themselves engage in some degree of commerce through transporting (1) mails to non-combatants and combatants; (2) goods of private persons under bills of lading issued by the officers of such vessels; and (3) commercial merchandise which is sold as an ordinary transaction at a profit to those on board. *Ritch v. Puget Sound Bridge & Dredging Co.,* 156 F.2d 334, 335–36 (9th Cir.1946); *see also Laudadio v. White Const. Co.,* 163 F.2d 383, 385 (2d Cir.1947) ("[I]t is extremely likely that the Navy did make some use of the Field for interstate commerce, such as the arrival and departure of officers, men and mail in interstate journeys."); 32 C.F.R. § 700.860 (outlining rules for customs and immigrations inspections where the Navy is carrying cargo for a private commercial account, for government-owned stores or cargo in such ship, or where United States civilian and foreign military and civilian passengers are aboard); 32 C.F.R. § 700.848 (outlining when a Navy vessel may receive on board merchant seamen).

The court further declines Plaintiffs' suggestion that the incident should be defined specific to asbestos exposure. Circuit courts applying *Grubart* have declined to define the "incident" at issue in such narrow terms. For example, in *Scarborough v. Clemco Indus.,* 391 F.3d 660 (5th Cir.2004), Scarborough worked aboard an abrasive sandblasting vessel which employed silica and other materials to maintain protective coatings of offshore oil platforms. After Scarborough passed away many years later, his family brought an action alleging that the safety hoods that he wore were defective and caused him to inhale silica and other materials for almost ten years. *Id.* at 665. Rather than characterize the incident specific to exposure to silica or contracting silicosis, *Scarborough* described the incident as "injury to a Jones Act seaman due to the negligence of a non-employer."[12] *Scarborough's* definition, like the one this court uses to define the incident, follows *Grubart's* instructions that it be defined with an intermediate level of generality and in light of the maritime context. Indeed, defining the incident more specifically based on the particular type of product defect and/or injury would result in leaving the maritime determination to chance based on the specific circumstances of the incident. Such result would resurrect *Myhran's* four-part test rejected by *Grubart* as too unpredictable. *See Grubart,* 513 U.S. at 547, 115 S.Ct. 1043.

Plaintiffs also argue that the court should follow the distinction made in *Conner* between active-duty sailors and land-based shipyard workers who are exposed to asbestos. Specifically, *Conner* deter-

---

**12.** Other examples include *In re Mission Bay Jet Sports, LLC,* 570 F.3d at 1129 (describing jet ski accident which occurred in cul-de-sac reserved for personal watercraft as "harm by a vessel in navigable waters to a passenger"); *Weaver v. Hollywood Casino–Aurora, Inc.,* 255 F.3d 379, 385 (7th Cir.2001) (describing injury to a slot machine attendant on a riverboat casino suffered while attempting to help a fellow employee crushed by a heavy chest as "an injury on board a vessel on navigable waters"); *White v. United States,* 53 F.3d 43, 44–45 (4th Cir.1995) (characterizing security guard's fractured nose from colliding with equipment on a pier after stumbling on the gangway as "injury to a person disembarking from a vessel in navigable water"); *Neely v. Club Med Mgmt. Serv.,* 63 F.3d 166, 179 (3d Cir.1995) (describing diving instructor's nerve damage and loss of arm function from being sucked into ship's propeller as "damage by a vessel in navigable water to a [seaman]") (alteration in original).

mined that "state law governs claims arising from predominantly land-based Navy work because a predominantly land-based Navy worker's exposure to defective products on or near ships does not have a potentially disruptive impact on maritime commerce." 799 F.Supp.2d at 468. *Conner* reasoned that "such workers are more removed from maritime commerce than their sea-based Navy counterparts," given that "the prospect of injuries to predominantly land-based workers is less likely to disrupt maritime commerce because such workers would not be at sea to defend commercial ships if necessary." *Id.* This reasoning does not help Plaintiffs—Cabasug was not a predominately land-based Navy worker and instead spent seventy-five percent of his time on ships in dry-dock. Indeed, after *Conner*, MDL Judge Robreno clarified in *Deuber* that admiralty law applies to shipyard workers who are exposed to asbestos aboard vessels in dry dock.[13] 2011 WL 6415339, at *1 n. 1. The first connection test is met.

b. *Whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity"*

■ For this second inquiry, "[t]o warrant jurisdiction, the tortfeasor's activity must be 'so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply.'" *Gruver*, 489 F.3d at 983 (quoting *Grubart*, 513 U.S. at 539, 115

S.Ct. 1043). "As a first step, [the court] must define what constitutes the 'activity giving rise to the incident.'" *Id.* (quoting *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043). In identifying the activity, the court must "focus on the 'general character of the activity,'" as opposed to the "precise factual antecedents of the incident at issue." *Id.* at 985 (quoting *Sisson*, 497 U.S. at 364–65, 110 S.Ct. 2892). With that said, however, the court must not characterize the activity "so generally as to ignore the maritime context." *Id.* at 986.

Applying these principles, the court finds that the general activity giving rise to the incident is the manufacture of products for use on vessels. *See Conner*, 799 F.Supp.2d at 469. This description of the activity focuses on its general character, while at the same time acknowledging the applicable maritime context.[14] Because the products at issue were certainly necessary for the proper functioning of the vessels, this court agrees with the reasoning in *Conner* that this allegedly defective production bears a substantial relationship to traditional maritime activity. *Id.*

In sum, the court finds that each of the *Sisson/Grubart* factors is met. As a result, Plaintiffs' claims are subject to admiralty law.

## IV. *CONCLUSION*

Based on the above, the court DENIES Plaintiffs' Motion to Apply the Substantive

---

**13.** Plaintiffs argue that *Conner* and *Deuber*, read together, create an absurd result that application of maritime law depends on the amount of time a shipyard worker spends on docked ships versus land. *See* Doc. No. 615, Pls.' Reply at 7–8. Contrary to Plaintiffs' protestations, this result is not absurd—where a worker spends the bulk of his time on a vessel in navigable waters, the nexus to maritime law is met. Such nexus does not exist where the worker does not spend time on vessels in navigable waters. This result comports with *Grubart's* defense of the *Sisson* test

that it "reflects customary practice in seeing jurisdiction as the norm when the tort originates with a vessel in navigable waters, and in treating departure from the locality principle as the exception." 513 U.S. at 547, 115 S.Ct. 1043.

**14.** In comparison, Plaintiffs suggest the general activity should be defined as "failure-to-warn of hazards of asbestos exposure." Doc. No. 615, Pls.' Reply at 9. This description, however, impermissibly ignores the maritime context. *See Gruver*, 489 F.3d at 986.

Law of Hawaii, Doc. No. 406, and determines that admiralty law applies.

IT IS SO ORDERED.